**TOBACCO AND ALLIED STOCKS, Inc.,
et al., Plaintiffs,**
v.
**TRANSAMERICA CORPORATION,
Defendant.**

Civ. A. No. 1468.

United States District Court
D. Delaware.

June 18, 1956.

See, also, 18 F.R.D. 355.

Daniel O. Hastings, Stewart Lynch and Clarence Taylor (of Hastings, Lynch & Taylor), Wilmington, Del., and Simon H. Rifkind, Samuel J. Silverman and Edward N. Costikyan (of Paul, Weiss, Rifkind, Wharton & Garrison), New York City, for plaintiffs.

Edwin D. Steel, Jr., George T. Coulson and William S. Megonigal, Jr. (of Morris, Steel, Nichols & Arsht), Wilmington, Del., and Gerhard A. Gesell and David E. McGiffert (of Covington & Burling), of Washington, D. C., for defendant.

LEAHY, Chief Judge.

On August 8, 1951, in related class actions brought by minority stockholders, I held defendant, Transamerica Corporation, violated Rule X–10B–5, promulgated by the Securities and Exchange Commission under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78j(b), in that preceding an offer to purchase Class A and Class B stock at a fixed price (plus a call on the A stock), defendant, a parent corporation and majority stockholder of its subsidi-ary, Axton-Fisher Tobacco Company, did not disclose to minority stockholders the true value of its inventory and pre-existing intent to capture the appreciation of such inventory upon merger or liquidation. I found the evidence made out a case for fraud. The amount of damages to be awarded and the persons to whom the judgment would run was left to the determination of a special master. See Speed v. Transamerica Corporation, D.C.Del., 99 F.Supp. 808, for fixing liability; issue of damages resolved in D.C. Del., 135 F.Supp. 176.

On July 10, 1952, present plaintiffs, owners of Class A common stock, started an independent suit again alleging violation of Rule X–10B–5. The request for relief included: an accounting of profits as well as monies and properties received; the impressing of a trust thereon; or, in the alternative, the awarding of damages; or, in the alternative, the rescission and setting aside of the sale. In addition to defenses on the merits to be tried before a jury, defendant asserts if jurisdiction is at law or, at most, concurrent, the Delaware statute of limitation bars the action, but if exclusively in equity, then the doctrine of laches. Plaintiffs contend jurisdiction is solely in equity, thus laches governs, but, they argue, neither laches nor limitation is a bar. It is these special defenses tried separately to the court under F.R. 42(b), 28 U.S.C., to which this particular opinion is directed.

Three questions are presented:

1. Whether the legal statute of limitation or the equitable doctrine of laches is applicable to this action, or both.

2. What principles of law appertain to the commencement of the period in question.

3. Whether under the facts this action is barred.

## I.

1. When Congress attaches a statute of limitation to a right it creates, it is conclusive. Absent express provision, however, the federal court makes, as it should, its own determina-

tion. Thus, where the action is termed one at law for which only legal remedies are available, the court will look to the local law of limitation. Campbell v. City of Haverhill, 155 U.S. 610, 15 S.Ct. 217, 39 L.Ed. 280; McClaine v. Rankin, 197 U.S. 154, 25 S.Ct. 410, 49 L.Ed. 702; Pufahl v. Estate of Parks, 299 U.S. 217, 57 S.Ct. 151, 81 L.Ed. 133; Williamson v. Columbia Gas & Electric Corp., D.C. Del., 27 F.Supp. 198, affirmed 3 Cir., 110 F.2d 15, certiorari denied 310 U.S. 639, 60 S.Ct. 1087, 84 L.Ed. 1407; Klein v. Lionel Corp., D.C.Del., 130 F.Supp. 725. Where the sole remedy is in equity, the doctrine of laches will be followed. Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743, following Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 84 L.Ed. 754. And in Russell v. Todd, supra, and Cope v. Anderson, 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602, the Supreme Court stated the rule where equity jurisdiction is exercised in aid or support of a legal right, or predicated upon a legal cause of action, or where it is concurrent with that at law, the federal court will withhold equitable relief if the forum's limitation would bar the concurrent legal right. In passing, it should be noted the standards differ somewhat in diversity cases where state created rights are in issue and in which the nature of the action is determined by referring to state law.[1]

2. Plaintiffs cite Kardon v. National Gypsum Company, D.C.Pa., 73 F.Supp. 798, 803, that the issues in this case are to be treated solely on equitable principles. In Kardon plaintiff stockholders were awarded an accounting for recovery of profits for a violation of Rule X–10B–5 by two directors. Proof of loss was not required on the ground plaintiffs' cause of action was not one for damages based on common law deceit. Judge Kirkpatrick said: " * * * the broad terms of the Act are to be made effective in a case like the present one through application of well known and well established equitable principles governing fiduciary relationships." But the ratio of that case was not founded on any issue of limitation, and accordingly it does not restrict the issue posed by the case at bar. This was recognized at pages 802–803: "Perhaps all that would be necessary for this decision would be the determination that the conduct of the defendants came within the terms of the Act and the remedy sought is one provided by the law for redress."

3. Much emphasis has been placed on the nature of the relief requested by plaintiffs here. Defendant interprets plaintiffs' alternative prayer for damages as indicative of the concurrency of jurisdiction under X–10B–5. Plaintiffs answer the award of damages is merely the incidental relief which equity traditionally gives to accord full justice to the parties. Both sides obviously misconceive its importance.

At common law, formalism was zealously guarded. Actions were either legal, that is, in the law courts, or equitable, in the courts of chancery. Consequently, the relief demanded by the mov-

[1.] Where the action is legal in nature, the federal court applies the statute of limitation of the forum under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. Similarly in actions deemed equitable, but in absence of limitation, the state doctrine of laches was held to apply in Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079. Although the Supreme Court has laid down no general rule governing concurrent jurisdiction in a diversity case, Cope v. Anderson, 331 U.S. 461, 67 S.Ct. 1340, 91 L.Ed. 1602; and dictum in Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 84 L.Ed. 754, dealing with federally created rights, the Third Circuit has ruled, a fortiori, the statute which bars the legal right also bars the equitable. Overfield v. Pennroad Corporation, 3 Cir., 146 F.2d 889. Both the applicable Pennsylvania law and the weight of legal opinion were found in that case to be in accord. In cases coming within its concurrent jurisdiction the Delaware Court of Chancery has considered itself bound to apply the statute controlling actions at law, Bovay v. H. M. Byllesby & Co., 27 Del.Ch. 33, 29 A.2d 801, except under special circumstances, Bovay v. H. N. Byllesby & Co., 27 Del.Ch. 381, 38 A.2d 808, 174 A.L.R. 1201.

ing party had to be consistent with the theory of its action. Today, in the face of rules ostensibly eliminating these distinctions, it would be incompatible to permit a period of limitation to hinge on the turn of a word fixed by a plaintiff at the pleading stage. And for this court to speculate on such a maneuver would compound the error and ignore the true standard in determining the nature of jurisdiction. In the final analysis, recourse should be had not to the language of the pleader's Complaint but to the terms of the federal act granting the right of action and to the remedy which the court can supply. The decisive feature, then, which gives jurisdiction the flavor of concurrency, is not the narrow question of whether formal relief requested in a particular action is equitable or legal, primary or incidental, but the broader determination of whether the federal right in issue may be judicially enforced in any action by means both legal and equitable.

■ 4. Defendant, arguing limitation is the prevailing doctrine, cites prior decisions under Rule X–10B–5 applying the forum's statute.[2] Plaintiffs minimize these holdings on the ground legal damages were sought, and hence the remedy was pursued on the law side. But plaintiffs' thesis, admitting the legal remedy, is in itself a concession that actions under X–10B–5 contemplate a concurrency of jurisdiction. The fact the concurrent remedy at law may be inadequate, as plaintiffs contend, is not material for "it is the inadequacy of the legal remedies to do complete justice that furnishes the foundation of the concurrent jurisdiction."[3] I therefore believe rights accruing under Rule X–10B–5 are enforceable at law and in equity and provide a proper case for concurrent jurisdiction in the federal courts.

■ I also find both limitation and laches in point notwithstanding the language in Russell v. Todd and Cope v. Anderson, supra. As I read those cases a defendant is not to be precluded from setting up the defense of laches if circumstances warrant its application. It is inconceivable a right capable of being enforced by legal and equitable means should not be required to meet the letter of both. True, the aforementioned X–10B–5 decisions applied limitation. But those decisions, in discussing which state statute governed, were only considering limitation. None considered fully the impact of concurrency. To my knowledge, no federal court has disposed of this precise issue, and in weighing the arguments incident to Rule X–10B–5, I would apply the same principles to any federal, concurrent right of action lacking the articulate congressional stamp of limitation.

■■ 5. As to the applicable Delaware statute of limitation, Title 10, § 8106 of the Revised Code of 1953 provides: "* * * no action based on a statute, and no action to recover damages caused by an injury unaccompanied with force or resulting indirectly from the act of the defendant shall be brought after the expiration of 3 years from the accruing of the cause of such action * * *". The phrase *action based on a statute* has been understood not to include actions existing at common law when the statute was adopted.[4] Rule X–10B–5, founded on common law fraud, is therefore excluded.[5] But an action un-

---

2. Osborne v. Mallory, D.C.S.D.N.Y., 86 F. Supp. 869; Fischman v. Raytheon Mfg. Co., 2 Cir., 188 F.2d 783; Northern Trust Co. v. Essaness Theatres Corp., D.C.N.D. Ill., 103 F.Supp. 954; Fratt v. Robinson, 9 Cir., 203 F.2d 627, 37 A.L.R.2d 636. Also see Seaboard Terminals Corp. v. Standard Oil Co., D.C.N.Y., 24 F.Supp. 1018; Dipson Theatres v. Buffalo Theatres, D.C.N.Y., 8 F.R.D. 86.

3. Per Judge Goodrich in Overfield v. Pennroad Corporation, 3 Cir., 146 F.2d 889, 895, note 12.

4. See 53 C.J.S., Limitations of Actions, § 83, p. 1052.

5. Fratt v. Robinson, 9 Cir., 203 F.2d 627, 635, 37 A.L.R.2d 636: "To hold otherwise would be paying tribute to form inconsistent with the spirit and substance of the rule." Accord: Thomas v. The Pick Hotels Corp., 10 Cir., 224 F.2d 664.

der X–10B–5 is historically an action on the case [6] and, as such, within the purview of the succeeding provision of the three year statute as quoted above.

■ The doctrine of laches, however, requires more than the mere lapse of time or a rigid and mechanical reference to the statute of limitation.[7] Its existence rests upon the equities of the parties as viewed by the court. This has been translated in terms of inexcusable delay in instituting suit plus prejudice resulting therefrom. See Gardner v. Panama R. Co., 342 U.S. 29, 30–31, 72 S.Ct. 12, 96 L.Ed. 31.

## II.

■ 1. I determine both the three year Delaware statute of limitation and the doctrine of laches rule this action. It then becomes necessary to ascertain at what point the period commences to run.[8] The strict rule, obtaining in courts of law, recites the cause of action for fraud accrues, and the period begins to run, when the fraud is successfully perpetrated. The equitable rule, adopted in several jurisdictions by the common law courts and by statute, counts from the time of the discovery of the fraud, as qualified in many decisions confining it substantially to cases of fraudulent concealment. The leading case in the federal courts applying the equitable rule to suits at law is Bailey v. Glover, 21 Wall. 342, 88 U.S. 342, 22 L.Ed. 636, decided in 1874. The Supreme Court held where there has been no fault or want of diligence or care, the bar of limitation included within a federally created right does not commence to run until fraud has been discovered. At page 348 of 21 Wall. (per Justice Miller): " * * * the decided weight of authority is in favor of the proposition that where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." Again at pages 349–350 of 21 Wall.: "While we might follow the construction of the State courts in this matter, where those statutes governed the case, in construing *this* statute of limitations passed by the Congress of the United States as part of the law of bankruptcy, we hold that when there has been no negligence or laches on the part of a plaintiff in coming to the knowledge of the fraud which is the foundation of the suit, and when the fraud has been concealed, or is of such character as to conceal itself, the statute does not begin to run until the fraud is discovered by, or becomes known to, the party suing, or those in privity with him."

Any indication in Bailey v. Glover, supra, limiting its doctrine to instances where Congress expressly incorporates a period of limitation in a right it creates, was nullified in Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743. The action there was grounded on a federal right which lacked an explicit statute of limitation and which was remedial only in equity. The Supreme Court, concluding federal laches rather than state limitation was controlling, fixed the fraud doctrine as an added dimension of all periods governing federally created rights. At page 397 of 327 U.S., at page 585 of 66 S.Ct. (per Justice Frankfurter): "It would be too incongruous to confine a federal right within the bare terms of a State statute of limitations

---

6. See Grier v. Dehan, 5 Houst., Del., 401; 2 Woolley, Delaware Practice §§ 1505, 1512 (1906); Loss, Securities Regulation 812–813 (1951).

7. Although the analogous statute of limitation bears weight as a standard of reasonableness, laches may bar relief either before or after the local statute has run. Kelley v. Boettcher, 8 Cir., 85 F. 55, 62; Russell v. Todd, 309 U.S. 280, 288–289, 60 S.Ct. 527, 84 L.Ed. 754; Holmberg v. Armbrecht, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743; Pomeroy, Equity Jurisprudence § 419(a); 37 C.J.S., Fraud, § 72, pp. 367–368 and cases cited.

8. See Kincheloe v. Farmer, 7 Cir., 214 F. 2d 604, certiorari denied, 348 U.S. 920, 75 S.Ct. 306, 99 L.Ed. 721.

unrelieved by the settled federal equitable doctrine as to fraud, when even a federal statute in the same terms would be given the mitigating construction required by that doctrine. * * * The federal doctrine applied in Bailey v. Glover, supra, and in the series of cases following it, governs." [9]

Restated, the federal doctrine means limitation and laches does not begin to run until evidence of fraud is discovered or could have been discovered had reasonable diligence been exercised, for whatever is notice calling for inquiry is notice of everything to which such inquiry might have led. Fraudulent concealment, of itself, is no longer a "tolling" device in the federal court, the reason for its existence having been removed in Bailey v. Glover, supra, relying, in part, on Stearns v. Page, 7 How. 819, 48 U.S. 819, 12 L.Ed. 928.[10] While the result may be the same, it is essential to give fraudulent concealment, at least in this context, its real significance as simply one vital factor in answering when the fraud was, or could have been discovered.[11] The federal courts, sitting in law and equity and interpreting a federal right, should not be plagued with notions founded on common law distinctions as announced by state courts.[12]

2. Plaintiffs urge defendant by reason of its fiduciary position, acts of concealment, and denial of fraudulent intent is estopped from relying upon the defenses of limitation or laches until actual knowledge of the deception was had. However, the existence of a trust relation and the type of concealment, if any, are not independent bases for estoppel. A person owed a fiduciary duty or one misled by acts of concealment is still bound to exercise such proper amount of diligence as circumstances require. These are considerations which will not negate a duty of reasonable diligence, once imposed, but will weigh in its determination. In that respect, waiver and estoppel, words of conceptualistic meaning, should have been washed down the legal drain centuries ago.

3. Furthermore, it is the considered opinion of this District and Circuit to view the information gained from the knowledge of public proceedings as sufficient to impose a duty of reasonable diligence if the circumstances require. In Henis v. Compania Agricola de Guatemala, D.C.Del., 116 F.Supp. 223, a stockholders' derivative action was brought alleging a civil conspiracy. Defendant's motion to dismiss was granted on the ground the action was barred by the statute of limitations. Said this court, at p. 227: "More than that, the facts alleged in the present complaint, involving the contract and issuance of the notes and stock were certainly known on or before February 14, 1949, when a group of stockholders instituted in the Supreme Court of New York the case of Ripley v. [International Railways of Central America, 196 Misc. 798, 95 N.Y. S.2d 202]. This suit contains essentially the same cause of action and would appear to seek the same relief as the one at the bar." Affirmed per curiam in 3 Cir., 210 F.2d 950. Also see Overfield v. Pennroad Corporation, 3 Cir., 146 F.

---

9. The federal doctrine is in accord with the law of Delaware respecting its statutes of limitation, Lieberman v. First National Bank of Wilmington, 2 Pennewill 416, 18 Del. 416, 45 A. 901, 48 L.R.A. 514; Trainer v. Deemer, 5 W.W.Harr. 396, 35 Del. 396, 166 A. 657, and adheres to the weight of authority in general, 17 R.C.L. 215 et seq.

10. The Bailey case has never been overruled or modified. See Wood v. Carpenter, 11 Otto 135, 101 U.S. 135, 25 L. Ed. 807; Norris v. Haggin, 136 U.S. 386, 10 S.Ct. 942, 34 L.Ed. 424; Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743.

11. See Sidebotham v. Robison, 9 Cir., 216 F.2d 816; Crummer Co. v. DuPont, D.C. E.D.N.Y., 117 F.Supp. 870.

12. Where distinctions prevail, the cases are explicit in requiring some affirmative act continuing the deception or preventing inquiry. Mere denials of fraud, they say, do not constitute concealment. The more enlightened jurisdictions, however, regard its presence as no more than that which constitutes the original cause of action.

2d 889, 898, holding facts disclosed by congressional investigation were matters of public information and relevant on any question of concealment whether or not plaintiffs had actual knowledge of the facts revealed.

4. Plaintiffs contend absent sufficient evidence of fraud, mere rumors and charges of wrongdoing do not impose any duty of diligent inquiry. References are to the early cases of Michoud v. Girod, 4 How. 503, 45 U.S. 503, 11 L.Ed. 1076, and Mudsill Mining Company v. Watrous, 6 Cir., 61 F. 163. I find no basis for such a proposition. The Michoud case simply held trust beneficiaries, far distant from the scene of transactions of which they complained, without benefit of modern communications or related litigation, and unwilling to believe they were defrauded by relatives acting as executors, were not barred by their delay in bringing suit merely because they suspected they were wronged. In short, suspicion will not raise a duty to inquire when circumstances do not permit reasonable investigation.

In Mudsill, plaintiff was fraudulently induced to purchase a silver mine from defendant. Upon suspicion of fraud plaintiff unsuccessfully attempted to return the mine. Plaintiff proceeded to uncover evidence to justify a demand for rescission, and an action was brought one year after the sale. The court did not rule suspicion created no duty of diligence but rather the duty, if any was present, had been met.

Plaintiffs also point to Hazel-Atlas Glass Company v. Hartford-Empire Company, 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, Shawkee Mfg. Company v. Hartford-Empire Company, 322 U.S. 271, 64 S.Ct. 1014, 88 L.Ed. 1269, and William Whitman Company v. Universal Oil Products Company, D.C.Del., 125 F.Supp. 137, to bolster their position. In Hazel-Atlas and Shawkee the basic question involved was the power to grant equitable relief against a fraudulently procured judgment. The Supreme Court found, 322 U.S. at pages 245–246, 64 S.Ct. at page 1001, the existence of "a deliberately

planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals." Mr. Justice Black, in Hazel-Atlas, said, 322 U.S. at page 246, 64 S.Ct. at page 1001:

"The Circuit Court did not hold that Hartford's fraud fell short of that which prompts equitable intervention, but that Hazel had not exercised proper diligence in uncovering the fraud and that this should stand in the way of its obtaining relief. We cannot understand how, under the admitted facts, Hazel should have been expected to do more than it did to uncover the fraud. But even if Hazel did not exercise the highest degree of diligence Hartford's fraud cannot be condoned for that reason alone. This matter does not concern only private parties. There are issues of great moment to the public in a patent suit. * * * Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud." The fraud in the Whitman case revolved around the bribery of a federal judge. Relying upon the Hazel-Atlas and Shawkee decisions, my Brother Rodney held, 125 F.Supp. at pages 158, 159:

"The time from which either limitation of time or laches should operate is material. The mere fact that fraud is involved does not prevent the running of limitation or consideration of laches, but the nature of the fraud is a matter for consideration. In most cases of rescission involving fraud, the fraud is personal to the parties and a party will be required to act when he has had or could reasonably be expected to have had

knowledge of the existence of the fraud, or of such facts as would put him upon inquiry. When, however, the alleged fraud involves the integrity of a judicial officer of almost the highest court of the country, reason and authority require that a large measure of reliance may be placed upon the presumption of probity inherent in the office and the establishment of the fraud prescribes the time from which the limitations or laches would run. I am of the opinion that when the Court of Appeals of the Third Circuit had commenced the investigation of the judicial conduct of Judge Davis, neither limitation nor laches by reason of his fraud began to run until his venality had been established by that tribunal."

Plaintiffs argue the presumption of probity in the Whitman case is not limited only to the integrity of a judicial officer or a judicial system, but embraces any person of responsibility and high reputation, and that this is substantiated in Hazel-Atlas and Shawkee (neither of which specifically involved fraud of a judicial officer). However, I am not prepared to give it that interpretation. Since those cases clearly spoke in terms of matters affecting the heart of the judicial system, whether touching the individual or the process, as opposed to matters of business activity between private litigants, there is no reason here to warrant either their application or their extension.

■ 5. What on the one hand is tantamount to an actual discovery of fraud should not be confused with what on the other carries a duty to investigate. It is impossible to lay down any general rule as to the amount of evidence or number or nature of evidential facts admitting discovery of fraud. But, facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud. Facts in the latter sense merely constitute objects of direct experience and, as such, may comprise rumors or vague charges if of sufficient substance to arouse suspicion. Thus, the duty of reasonable diligence is an obligation imposed by law solely under the peculiar circumstances of each case, including existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings.

### III.

■ A. Since the special defenses of laches and limitations were tried to the court without a jury, findings of fact are required under F.R. 52:

1. Plaintiff Tobacco and Allied Stocks, Inc. ("T & A") was a Delaware corporation and a holding company for securities of companies in the tobacco business and allied industries.[13] It was dissolved about January 1955. Plaintiff Cullman Bros., Inc., is a New York corporation engaged in the tobacco business.[14] Another plaintiff Cullman Brothers is a partnership which has a seat on the tobacco exchange. It buys and sells securities for other persons.[15] The partnership started in 1934 and until 1946 Joseph F. Cullman, Jr. and Howard S. Cullman were the partners. In 1946 Joseph T. O'Brien became a partner The same year Edgar M. Cullman joined the firm.[16]

Joseph F. Cullman, Jr., since 1929, was president, director and member of the Executive Committee of T & A. He was also president and director of Cullman Bros., Inc., and a partner of Cullman Brothers.[17] He had authority to buy and

13. Complaint par. 2; J. Cullman Dep. 36; Wharton Dep. 6–7.

14. Complaint par. 2; J. Cullman Dep. I, 39–40.

15. Complaint par. 2; J. Cullman Dep. I, 40.

16. Interrogatories 22, 23 (plaintiff's answers).

17. J. Cullman Dep. I, 36–37, 39; Ans. 4, 9, 23 of T & A; Joseph F. Cullman, Jr. to defendant's interrogatories.

sell T & A stock and he dealt with the affairs of Axton-Fisher Tobacco Company [18] ("Axton"). In his absence his brother Howard S. Cullman assumed his responsibilities.[19] H. Cullman, since 1929, was vice-president, director and executive committee member of T & A.[20] Likewise he was vice-president and director of Cullman Bros., Inc., and a partner of Cullman Brothers.

John F. Wharton, Esq., since 1929, was a member of the executive committee and a director of T & A.[21] Since 1929 his law firm (now Paul, Weiss, Rifkind, Wharton & Garrison) has been counsel for T & A. He was partner in charge of T & A's affairs and is counsel for plaintiffs in the case at bar.[22] Mortimer S. Edelstein, Esq., was Wharton's assistant as to T & A from 1944 until he left the firm in 1950.[23]

Axton was a Kentucky corporation engaged in the manufacture of cigarettes and other tobacco products. Carl B. Robbins was its executive officer from 1941 to 1943.[24] The remaining corporate role was played by Transamerica Corporation ("Transamerica"), a Delaware corporation, and a holding company for securities. Its first interest in Axton was a purchase in 1941 of 80,610 shares of Axton Class B common stock (71.5% of that class) (46.7% of the total voting stock).[25] At the time of the purchase Axton had issued and outstanding:[26] 14,136 preferred, 45,465 Class A, 112,012 Class B.

Identification of the master plaintiffs in the case at bar follows. J. F. Cullman, Jr., lived in the tobacco business. At one time he was president of Benson & Hedges, Webster Cigar Company and (1954) chairman of the executive committee of Philip Morris—a director of American Sumatra Tobacco Company and (1940–1942) a director of Axton [27] and with another (a Mr. Kirk) a supervisor of all leaf tobacco purchases made by Axton.[28] H. S. Cullman was also a tobacco man since 1913.[29] He was a director of Axton (1939–1940). J. F. Wharton was a director of Benson & Hedges, American Houses, Inc., Simon & Shuster, Pocket Books, Inc., and Vitarama Corporation.[30] Wertheim & Co. (represented, here, by Cullman Bros., Inc., see infra) is a partnership of investors, brokers and underwriters, since 1927.[31] Sumner Ford, Esq., has been a partner of Breed, Abbott and Morgan for 33 years.[32] Irving Sartorius is a stockholder.[33] Junius Richards is a director of H. N. Whitney, Goadby & Co., security dealers, and a director of T & A.[34]

2. The evidence is clear T & A and the Cullmans were in the midst of Axton during 1939–43. T & A started to buy Axton A shares in 1938.[35] J. F. Cullman, Jr., and Maurice Wertheim were participants in the syndicate which acquired control of Axton in 1939. Both were directors of Axton; and J. F. Cullman remained as a director a year after Transamerica acquired its dominant control.[36] He met C. M. Giannini in Louisville in July 1941 [37] and talked to him.[38] A year before T & A sold its Axton stock to Transamerica the evidence suggests

18. Wharton Dep. 33–34; H. Cullman Dep. 8.

19. Wharton Dep. 34.

20. H. Cullman Dep. 3–4.

21. Wharton Dep. 5.

22. Id., 3–5.

23. Id., 19–20, 22; Edelstein Dep. 5.

24. Complaint par. 3; Answer par. 3.

25. Id., par. 15; id., par. 6.

26. Id., pars. 12, 13; id., par. 5.

27. H. Cullman Dep. 5–6; J. Cullman Dep. I, 36–39; Phillip Morris Annual Report (1954).

28. J. Cullman Dep. I, 9.

29. H. Cullman Dep. 7–8.

30. Wharton Dep. 5–6.

31. Klingenstein Dep. 33.

32. S. Ford Dep. 100.

33. Sartorius Dep. 1–2.

34. Richards Dep. 1–2.

35. J. Cullman, Dep. 1, 74.

36. Id., 61; H. Cullman Dep. 5; DX Wharton No. 20; DX (T) No. 45.

37. J. Cullman Dep. I, 10; Id., Dep. II, 6–10; DX J. Cullman No. 19.

38. J. Cullman Dep. II, 16.

J. F. Cullman, Jr., "might have" discussed such sale with W. L. Lyons, Jr.[39] Lyons was a Louisville broker who in September 1942 managed the sale of T & A's Axton Class A to Transamerica.[40] Plans suggested by Transamerica for rearrangement of Axton's capital structure were unsatisfactory to J. F. Cullman, Jr.,[41] including the plan suggested in the Registration Statement eventually filed by Axton with the Securities and Exchange Commission[42] on February 13, 1942, the day after J. F. Cullman, Jr., resigned as a director of Axton.[43] Several weeks later, on March 3, 1942, J. F. Cullman and Wharton conferred with the SEC about Axton; but Cullman had no recollection of such a conference when his deposition was taken.[44] Then on May 4, 1942, Axton sought SEC's consent to withdraw the Registration Statement. Several days later it publicly abandoned its suggested recapitalization plan.[45] J. F. Cullman, Jr., knew about the withdrawal of the plan.[46]

Then on May 22, 1942, J. F. Cullman, Jr., wrote to L. M. Giannini and suggested liquidation of Axton.[47] Giannini replied on May 27, 1942.[48] On June 9,

1942, J. F. Cullman, Jr., answered Giannini;[49] Giannini again wrote Cullman on June 16, 1942.[50] Later in the summer or fall of 1942 Cullman talked with both Philip Morris and American Tobacco Company.[51]

On September 18, 1942, Transamerica bought Class A of Axton from the following (plaintiffs):[52]

| | |
|---|---:|
| Gunn & Co. (T & A nominee) | 6,095[53] |
| Wertheim & Co | 2,235 |
| Lillian Riegelman | 100 |
| William A. Sunkenberg | 30 |
| Sumner Ford | 100 |
| Helen S. Ford | 50 |
| A. S. Holding Co., Inc. | 500 |
| Joseph F. Cullman, Jr. | 10 |
| Howard S. Cullman | 10 |
| Cullman Brothers | 30 |
| Solomon W. Schaefer | 50 |
| H. N. Whitney, Goadby & Co. | 80 |
| White, Weld & Co. | 50 |
| Estate of Edythe A. Sartorius | 90 |
| | 9,430 |

Transamerica bought the 9,430 Class A shares listed above at $47.50 a share.[54] The price was $21.50 above the high

39. Id., 128–29.

40. J. Cullman, Dep. I, 21–22; DX J. Cullman No. 36.

41. J. Cullman Dep. II, 18–20; H. Cullman Dep. 8–9; DX J. Cullman Nos. 18, 21, 22.

42. DX J. Cullman Nos. 22, 23A; H. Cullman Dep. 9.

43. DX Wharton Nos. 19, 20.

44. DX Edelstein No. 14; J. Cullman Dep. II, 34–35.

45. Complaint par. 21; DX J. Cullman No. 23A.

46. DX J. Cullman Nos. 23, 23A; J. Cullman Dep. II, 27–28.

47. PX J. Cullman No. 2.

48. PX J. Cullman No. 2: "With regard to the matter which is the main subject of your letter, my personal guess is that such a plan would not now meet with the approval of Transamerica Corporation, but I would suggest that if you have something definite in mind you should submit it to Transamerica Corporation in concrete form. I am sure that anything you might have to say to them will receive serious and considerate consideration."

49. PX J. Cullman No. 3: "I have carefully noted that your personal guess is that the outline of the plan I submitted to you would not now meet with the approval of Transamerica Corporation; nevertheless as I have something very concrete in mind for the future I would greatly appreciate your advising me whom in Transamerica Corporation I should contact that I can further our mutual interest in the company."

50. PX J. Cullman No. 4: "In your letter of June 9th you inquire as to the proper person for you to correspond with at Transamerica Corporation. Mr. W. L. Andrews, Vice-President and Treasurer of the Corporation, is handling most of its affairs at this time, and I think he would be the proper person for you to contact with any plan that you may want to discuss with Transamerica Corporation."

51. J. Cullman Dep. II, 110–16; Id., Dep. I, 99–103.

52. DX Cohen No. 1; DX Wharton No. 26B; Complaint pars. 6, 7, 10, 11.

53. T & A realized a profit of $49,832.11 from this transaction (DX (T) 9).

54. Complaint par. 28; Answer par. 17.

on the market for that month, as was known.[55]

J. F. Cullman, Jr., followed Axton's affairs after the sale of T & A's stock. On May 10, 1943, Holman Wilson, another Louisville broker, inquired of Cullman of the advisability of converting Axton Class A into B shares as Transamerica had done, or to accept the redemption price.[56] Cullman gave his advice on the matter.[57] From the time it sold its Axton A stock and down to Axton's liquidation, T & A dealt in both Class B and preferred stock of Axton.[58]

3. The master incidents in Transamerica's scheme to defraud now became apparent. Axton withdrew its Registration Statement and Plan of Recapitalization from the SEC in May 1942,[59] before plaintiffs sold their Axton stock in September 1942. On November 12, 1942 Transamerica made a written offer to Axton Class A and B shareholders.[60] On March 29, 1943 Transamerica con-

55. DX Wharton No. 32; Wharton Dep. 120–21.

56. DX J. Cullman No. 2.

57. Id., No. 3: *"I have kept pretty well posted on the Axton-Fisher matter.* It seems to me that the smart thing to do would be to obtain for the 'A' stock you and the people you represent own, the call price and call it a day. After all you are getting a full pound of flesh and then some out of it.

"Irrespective of whatever the plans may be of the Giannini group the price obtained for the 'A' stock by letting it be called is more in my opinion than anyone will get in the immediate future by conversion." (DX J. Cullman No. 3) (emphasis supplied).

58. DX Richards No. 4; DX Wharton No. 35.

59. Complaint par. 21; DX J. Cullman 23A.

60. DX J. Cullman No. 1:

"TRANSAMERICA CORPORATION
Montgomery Street at Columbus Avenue
San Francisco, California
November 12, 1942

"To the Holders of Class A and Class B Common Stock of The Axton-Fisher Tobacco Company

"We hereby offer to purchase from the holders thereof, for cash, all shares of common stock of The Axton-Fisher Tobacco Company owned by them of record, or actually owned by them, at the close of business October 31, 1942, as to which valid acceptances (as determined by us) of this offer are received before the close of business on November 27, 1942, at the following prices:

"$40 per share for Class A common stock.

"$12 per share for Class B common stock.

"It is a condition of this offer for Class A common stock that valid acceptances be received from the holders of not less than 24,000 shares of said stock or such lesser number as is acceptable to us and it is a condition of the offer for Class B common stock that valid acceptances be received from the holders of not less than 18,000 shares of such stock or such lesser number as is acceptable to us.

"Stockholders desiring to accept the offer should deliver their stock certificates with the enclosed form of Acceptance and Assignment (following carefully the procedure for signing set forth on the form) to Fidelity & Columbia Trust Company, 5th and Jefferson Streets, Louisville, Kentucky.

"Payment of the purchase price will be made promptly, after the requisite number of valid acceptances have been received, on clearance of the stock for transfer by the transfer agent thereof.

"If our offer does not become effective by the close of business on November 27, 1942, your stock certificates and form of Acceptance and Assignment will be returned to you by registered mail promptly thereafter, without expense to you.

"Any inquiries regarding the offer may be addressed to us. Additional forms of the Acceptance and Assignment may be obtained from us or Fidelity & Columbia Trust Company.

"Very truly yours,
"Transamerica Corporation,
"(S) (W. L. Andrews)
"W. L. Andrews
Vice President and
Treasurer"

verted its 30,068 Class A of Axton into Class B on a share per share basis in accordance with the conversion provisions of Axton's charter. On April 30, 1943 the remaining Class A publicly held were called for redemption.[61] On May 27, 1944 Axton's Board recommended liquidation of the corporate assets, and transmitted for execution a form of consent to Class B shareholders.[62] On June 20, 1944 Axton sold its real property, machinery, equipment, etc., trademarks, etc., and about 8,710,000 pounds of tobacco to Philip Morris.[63] On June 21, 1944 Axton paid a partial liquidating dividend to its Class B common shareholders, and negotiable warehouse receipts each representing 65 pounds of flue-cured tobacco leaf, 30 of flue-cured tobacco leaf strips, and 46 of burley tobacco leaf.[64]

From the evidence I am persuaded T & A was aware of all this: e. g., J. F. Cullman, Jr., knew of the withdrawal of the Registration Statement from the SEC;[65] he was aware of the appreciated value of Axton's tobacco inventory;[66] he knew of the public offer to purchase both Class A and B Axton stock,[67] saw the offering letter,[68] and knew the offered price was in excess of the market price;[69] he knew of Transamerica's conversion of its Class A into Class B,[70] and that the remaining publicly held shares of Class A were called for redemption;[71] and, finally, he knew Axton's liquidation of assets took place, in fact, in the spring of 1944.[72]

4. On August 15, 1944, the SEC made an "Order Directing Investigation and Designating Officers to Take Testimony" in re The Axton-Fisher Tobacco Company—Transamerica. This was bottomed on the fact that from August 14, 1942 to March 1943, Transamerica had bought 24,836 Axton Class A (including the 9,-430 shares sold by plaintiffs in September 1942 and the shares acquired by Transamerica from its public offer of November 1942). The SEC charged while Transamerica was upon such acquisition there were discussions for the sale of Axton's assets to Philip Morris and for either Axton's liquidation or merger with Philip Morris. Moreover, Transamerica was alleged to have failed to disclose the dramatic appreciation of the Axton tobacco inventory. The order of the SEC concluded if its allegations were true it looked as if Transamerica had violated § 10(b) of the Securities Exchange Act of 1934 and Rule X–10B–5.[73] The August 1944 Order of the SEC was published in the financial pages of The New York Times in September 1944 [74] as well as in The Wall Street Journal.[75] At least The Wall Street Journal publication came to the attention of J. F. Cullman, Jr.[76] He reported the critical features of the SEC's investigation to the T & A Board of Directors on September 25, 1944, and undertook to "report from time to time any subsequent developments arising out of the Securities and Exchange Commission's investigation." [77] T & A's interest in the investigation continued during October 1944. M. S. Edelstein (one of T & A's attorneys and assistant to Wharton) discussed with Wharton the minutes of the T & A board

61. Id., No. 4.

62. Id., Nos. 5, 6, 7.

63. Id., No. 8.

64. Id., Nos. 11, 9, 10.

65. Id., Nos. 23, 23A; J. Cullman Dep. II, 27–28.

66. Complaint par. 19.

67. J. Cullman, Dep. I, 72; see Wharton Dep. 128–129.

68. J. Cullman, Dep. I, 72.

69. Id., 72–74.

70. Id., 77–78; DX J. Cullman Nos. 2, 3; see Wharton Dep. 135.

71. J. Cullman Dep. I, 80; DX J. Cullman Nos. 2, 3; see Wharton Dep. 136.

72. J. Cullman Dep. I, 25–26, 85–88; see Wharton Dep. 148–149.

73. DX Wharton No. 4–A.

74. Id., No. 42.

75. Id., No. 43.

76. J. Cullman Dep. I, 137; DX Edelstein No. 2; Scheurermann 3, 41, 45–46.

77. DX Wharton No. 41.

meeting of September 25, 1944.[78]  H. S. Cullman on October 25, 1944, inquired of Edelstein about the SEC investigation.[79] The next day Senator Hastings (one of plaintiffs' counsel in the case at bar and chief counsel in the subsequent Speed and Friedman cases before this court) sent the complete text of the SEC Order to Edelstein [80] who discussed it with Wharton.[81]

5. Contemporaneously with the recent events I have just been discussing there commenced in the United States District Court for Delaware active litigation to recover from Transamerica for its scheme to defraud Class A and B shareholders of Axton.[82]

Friedman v. Transamerica (our CA 468) was started in our court on August 31, 1944.[83] Edelstein learned of this on October 5, 1944 by Seymour M. Heilbron of Hays, St. John, Abramson & Schulman.[84] Heilbron had telephoned for information of the T & A sale of Axton stock to Transamerica and "also inquired whether T & A might be interested in joining in the stockholders suit".[85] The next day Edelstein discussed the matter with Wharton,[86] and the same day Heilbron wrote Edelstein enclosing a copy of the Friedman complaint.[87] Wharton sent the copy to Cullman several days later,[88] who either read it or had its contents explained to him.[89] This complaint attacked the redemption of the Axton Class A shares (April 30, 1943) 7½ months after T & A sold its Class A to Transamerica. Paragraph 12 charged Transamerica with a pre-existing intent to liquidate Axton prior to August 31, 1942.[90] This charge was abandoned when the Friedman plaintiffs filed their amended complaint on October 16, 1945. The amended complaint, paragraph 17, charged the plan to capture the value in Axton was conceived "Sometime prior to April 30, 1943, the exact time being unknown to plaintiffs * * *". On November 1, 1945 Transamerica filed a further motion to dismiss the amended complaint; or, failing that, for a more definite statement or for a bill of particulars. On August 8, 1947, Friedman plaintiffs complied, setting the time "as early as the summer of 1942." [91]

78. DX Edelstein No. 4.

79. Id., No. 3.

80. DX Wharton Nos. 4, 4A.

81. Wharton Dep. 183.

82. For the published opinions see: Geller v. Transamerica Corp., D.C.Del., 53 F. Supp. 625; Id., D.C., 63 F.Supp. 248, affirmed 3 Cir., 151 F.2d 534; Zahn v. Transamerica Corp., D.C., 63 F.Supp. 243, reversed 3 Cir., 162 F.2d 36, 172 A.L.R. 495; Speed v. Transamerica Corp., D.C., 5 F.R.D. 56; Id., D.C., 71 F.Supp. 457; Id., D.C., 103 F.Supp. 47; Friedman v. Transamerica Corp., D.C., 63 F. Supp. 247; Id., D.C., 5 F.R.D. 115; Speed v. Transamerica Corp. (Friedman v. Transamerica Corp.; Zahn v. Transamerica Corp.), D.C., 99 F.Supp. 808; Id., D.C., 100 F.Supp. 461; Id., D.C., 100 F. Supp. 463; Id., D.C., 135 F.Supp. 176, 203.

83. DX (T) No. 41A.

84. DX Edelstein No. 3.

85. Id., No. 3.

86. Id., Nos. 3, 4.

87. DX Wharton Nos. 2, 13.

88. DX Edelstein No. 5; J. Cullman Dep. II, 173–174.

89. J. Cullman Dep. II, 176.

90. DX Wharton No. 13, Friedman complaint, par. 12:

"XII. Sometime prior to August 31, 1942, or thereabouts, the exact date being unknown to the plaintiffs, Transamerica conceived and formulated a plan to acquire domination and control of Axton-Fisher through the acquisition of a majority, or two-thirds of each class of its voting shares, depending upon the vote required for dissolution, liquidation, merger or consolidation, with the intention and purpose of securing for itself substantial profits upon its investment in said Axton-Fisher shares by bringing about a dissolution, liquidation, merger or consolidation of Axton-Fisher, or a sale of substantially all its assets; and with the further intention and purpose of depriving the remaining or minority stockholders of Axton–Fisher of their fair share of the profits so to be realized."

91. DX (T) No. 41–A, contains a paragraph alleging:

"That as early as the summer of 1942 Mario Giannini, the controlling figure of the defendant, consulted with Carl B.

Speed v. Transamerica (our CA 480) was started here on October 19, 1944.[92] This came to the attention of H. Cullman and T & A attorneys on October 25, 1944.[93] On the same day Arthur Frank (who together with Senator Hastings were chief counsel for Speed, et al.) sent Edelstein a copy of the complaint.[94] Both Edelstein and Wharton were aware of the allegations of this complaint.[95] The complaint dealt with the purchase of Axton stock by Transamerica from Class A and B minority shareholders under the public offer of November 12, 1942, and charged as early as May 1942 Transamerica had conceived the scheme to capture for itself alone the hidden profit in Axton's tobacco inventory.[96] In their motion to dismiss, Transamerica summarized the allegations of the complaint leaving no doubt as to the import

contained therein.[97] It is clear Wharton read the Speed complaint and knew if its allegations were true, T & A had a cause of action against Transamerica.[98]

6. On October 25, 1944, about a week after Speed v. Transamerica was filed in our court, both Senator Hastings and Arthur Frank, plaintiffs' counsel in both Speed and Friedman, came to the offices of T & A in New York and conferred with H. S. Cullman and C. C. Scheuermann, both T & A officers, and M. S. Edelstein, one of the company's counsel. Two writings came out of this conference: one by Edelstein and one by Frank.[99] At the conference Senator Hastings knew Judge Charles I. Dawson had argued to the Kentucky Court of Appeals [100] Transamerica had attempted to "flim-flam" Axton's Class A shareholders; [101] and Senator Hastings, at

---

Robbins, the President of Axton-Fisher, whom defendant claims was the only man on the Axton-Fisher Board named by the defendant, as to the best way of capturing the profits growing out of a great increase in the value of Axton-Fisher tobacco inventory; said Giannini was then considering the liquidation but told the said Robbins to continue operating Axton-Fisher at least for the time being, as though the operation were going to be permanent, and Axton-Fisher did continue advertising, etc., which indicated it would continue operating its business; * * *."

92. DX (T) No. 41B.

93. DX Wharton No. 14.

94. Id., Nos. 3, 3A.

95. Edelstein Dep. 115; Wharton Dep. 159, 180.

96. Speed Complaint: Pars. 19, 23, 25, 26, 27, 32, 33, 44, and 45. Par. 44 of the Speed Complaint (DX Wharton No. 3A) charged:
"44. Upon information and belief, plaintiffs aver that defendant, Transamerica, did not desire to disclose to the Securities Commission through Axton-Fisher its intentions with respect to the payment of dividends on and the redemption of the 6% prior preferred and Class A common stock and with respect to the holding or disposition of the Class B common shares then owned by it, that defendant thereupon* devised a fraudulent scheme to acquire, at the expense of the

minority stockholders of Axton-Fisher, their holdings of stock of said Axton-Fisher at the lowest possible price and at a price greatly less than the real value thereof with the improper intention thereafter by means of a merger or liquidation to capture for itself, and at the expense of the minority stockholders of Axton-Fisher, the huge increase in the value of the tobacco inventory which it had been concealing from the minority stockholders of Axton-Fisher."
* I. e., in May of 1942 when Axton's 'Preferred Stock Plan of Recapitalization' was withdrawn from the SEC."

97. At pp. 4–5, in part:
"Following the abandonment of the Recapitalization Plan, defendant devised a 'fraudulent scheme' to acquire the stock owned by minority stockholders of Axton-Fisher at the lowest possible price, for the purpose of capturing for itself, by means of a merger or liquidation, the huge increase in the tobacco inventory of Axton-Fisher which had been concealed from the minority stockholders (Par. 44)."

98. Wharton Dep., 181–182.

99. DX Wharton No. 14; DX Hastings No. 2; DX Frank No. 2.

100. Taylor v. Axton-Fisher Tobacco Co., 1943, 295 Ky. 226, 173 S.W.2d 377, 148 A.L.R. 834.

101. DX (T) No. 40, par. 3; DX Hastings No. 4; DX Edelstein No. 52.

the conference, "outlined in great detail" the facts of the Speed and Friedman cases.[102] Both H. Cullman and the T & A attorneys learned that Senator Hastings intended "to establish fraud on the part of Transamerica in dealing with stockholders [sic Axton's Class A and B] sometime in the Spring of 1942" and he "hoped to relate a course of fraud on the part of Transamerica back to the time when the Registration Statement was withdrawn." [103]

*A critical fact was exposed at that conference: H. Cullman and the T & A attorneys learned Arthur Frank had interviewed Carl Robbins, former president of Axton, and Frank was told by Robbins that Giannini urged him "sometime in the Spring or Summer of 1942" to do something about the liquidation of the Axton-Fisher tobacco inventory.*[104] Everyone at the conference considered such a liquidation as tantamount to the liquidation of Axton as a corporate enterprise.[105] Possibility of T & A and the other plaintiffs joining the Speed case was discussed.[106] Senator Hastings had doubt if T & A had a cause of action, and

Frank suggested T & A check the statute of limitations.[107]

The October 25, 1944 conference was reported to T & A directors on November 13, 1944.[108] T & A's counsel were asked to examine Transamerica's liability, and J. F. Cullman, Jr., was authorized to obtain Senator Hastings' opinion whether T & A had a cause of action.[109]

7. Zahn v. Transamerica (our CA 490) was started here on November 21, 1944. The complaint, in paragraph 12, dated the conception of the plan to liquidate as being "in the latter part of 1942 and in the early part of 1943". The sale of these plaintiffs' shares occurred 7½ months prior to redemption (April 30, 1943).

Between April and June 1946, letters and telephone calls were exchanged between Edelstein and Frank concerning J. F. Cullman, Jr.'s affidavit which was to be used in the Speed case against Transamerica's motion for summary judgment filed in that case. Such an affidavit was supplied.[110] Wharton, Edelstein and Cohen read the first Court of Appeals decision in the Zahn case,[111]

---

102. DX Hastings No. 2; DX Frank No. 2.

103. DX Wharton No. 14; H. Cullman Dep. 41.

104. DX Wharton No. 14.

105. DX J. Cullman Nos. 14, 15; J. Cullman Dep. II, 112, 113; see Robbins Dep. I, 54–55.

106. J. Cullman Dep. I, 44–45.

107. DX Wharton No. 14.

108. Id., No. 44.

109. Id., DX Richards No. 6.

110. DX Wharton Nos. 5–10, 45; J. Cullman Dep. II, 245–6; Wharton Dep. 212, 221.

111. 3 Cir., 162 F.2d 36, 172 A.L.R. 495. At page 39, of 162 F.2d:
"The complaint then alleges the gist of the plaintiff's grievance, viz., that Transamerica, knowing of the great value of the tobacco which Axton-Fisher possessed, conceived a plan to appropriate the value of the tobacco to itself by redeeming the Class A stock at the price of $60 a share plus accrued dividends, the redemption being made to appear as if 'incident to the continuance of the business of Axton-Fisher as a going concern,' and thereafter, the redemption of the Class A stock being completed, to liquidate Axton-Fisher; that this would result, after the disbursal of the sum required to be paid to the preferred stock, in Transamerica gaining for itself most of the value of the warehouse tobacco.

* * * * *

" * * * It must be pointed out that under the allegations of the complaint there was no reason for the redemption of the Class A stock to be followed by the liquidation of Axton-Fisher except to enable the Class B stock to profit at the expense of the Class A stock.

* * * * *

" * * * If the allegations of the complaint be proved, it follows that the directors of Axton-Fisher, the instruments of Transamerica, have been derelict in that duty. Liability which flows from the dereliction must be imposed upon Transamerica which, under the allegations of the complaint, constituted the board of Axton-Fisher and controlled it."

handed down August 13, 1946, sustaining the validity of the complaint as a cause of action. The Court specified no date for the conception of defendant's plan except to state the complaint alleged the plan was formulated before redemption (April 30, 1943). The opinion appeared in the December 26, 1946 issue of the New York Law Journal. Cohen discussed it with J. F. Cullman, Jr., and Wharton.[112] After the Court of Appeals opinion was filed T & A's lawyers reviewed the Edelstein memorandum of October 25, 1944 and "checked the New York Statute of Limitations re fraud".[113]

In January 1947 Edelstein conferred with Frank's firm about the Zahn case;[114] Wharton wrote J. F. Cullman, Jr., stating the Zahn opinion had been read and "I think we should review the situation at the next T & A board meeting, and I will be glad to discuss the matter with you personally before then if you care to do so." [115] Cullman agreed to discuss the matter.[116] But neither Cullman nor Wharton could recall any such further discussion.[117]

8. On April 5 and 6, 1948, the Speed, Friedman and Zahn cases were tried before this court. On August 8, 1951 I decided the cases by opinion, finding as a crucial fact the existence of a plan prior to November 12, 1942, a fortiori August 30, 1943, to capture the Axton-Fisher inventory. T & A and Cullman were informed of the decision.[118] On July 10, 1952, plaintiffs filed their complaint which sought to relate the intent to liquidate back to May 1942, and prior to September 18, 1942, the date plaintiffs sold their shares to defendant.

9. Since the illegal scheme had its inception, witnesses have died and recollections have failed. Only litigious shadows remain. L. M. Giannini died in August 1952, over a month after the complaint in the case at bar was filed.[119] That complaint alleged (after the benefit of this court's findings) Giannini and Transamerica secretly planned to liquidate Axton; and present defendant is deprived of the testimony of the one person able to refute this.[120] The depositions in the Speed, Friedman and Zahn cases do not relate to the misrepresentations alleged in the instant case as to Cullman's visit with representatives of Transamerica in 1942, etc.[121] Among others who have died are: W. L. Andrews, vice-president and treasurer of Transamerica;[122] J. F. Cullman, Jr.;[123] Maurice Wertheim;[124] Fletcher Gill, T & A executive committee member together with the Cullmans and Wharton;[125] and Seton Porter, T & A director, who arranged the October 25, 1944 conference with Senator Hastings and Arthur Frank.[126]

Recollections are not in focus about the pre-sale Cullman-Axton-Transamerica transaction. Even the target of the direct misrepresentations (J. F. Cullman, Jr.) states he "could not be positive about anything that happened so long ago." [127] The fog of recollection which engulfed J. F. Cullman: No recollection of discussion of sale of Axton Class A owned by T & A to Transamerica with W. L. Lyons, Jr., in November, 1941, a year before the sale.[128] He had not the "slightest recollection" of conference

112. Wharton Dep. 255; DX Edelstein No. 12; Edelstein Dep. 119–120; Cohen Dep. 35, 36; DX Edelstein Nos. 9, 51.

113. DX Edelstein No. 11.

114. Id., No. 13; Edelstein Dep. 76.

115. DX Edelstein No. 49.

116. Id., No. 50.

117. J. Cullman Dep. II, 252; Wharton Dep. 262–263.

118. Sunkenberg Dep. 27–29; see DX Wharton No. 26B.

119. DX (T) No. 36.

120. Complaint pars. 16, 22.

121. J. Cullman Dep. I, 5–8.

122. DX (T) No. 37.

123. R. 2.

124. DX (T) No. 38.

125. Wharton Dep. 9–11, 91.

126. DX (T) No. 45.

127. J. Cullman Dep. II, 139.

128. J. Cullman Dep. II, 128–129; see DX (T) No. 32.

with SEC in March 1942.[129] He was unable to remember the two representatives of Transamerica who visited him in 1942.[130] He could not recall if he communicated with W. L. Andrews as suggested by Giannini in June 1942.[131] He did not remember talking with Robbins in New York in August 1942.[132] He was unable to state whether he or W. L. Lyons, Jr., began the negotiations for the sale of the Axton A shares.[133]

10. There are more than a dozen plaintiffs other than those I have discussed. The relevant facts as to them will be noted.

As stated, Wertheim and Co. is a partnership engaged in the investment and brokerage business.[134] Transamerica acquired 2,235 of their Axton A stock on September 18, 1942.[135] This stock is represented, here, by Cullman Bros., Inc., who hold it by assignment.[136] Maurice Wertheim was senior partner (died May 27, 1950).[137] His job was "development of special deals"; and the Axton stock was regarded as such; he followed this security and had his communications with the Cullmans.[138] The partnership was a member of the syndicate which acquired control of Axton in 1939, and M. Wertheim was one of its directors (1940–41);[139] he was also a long friend of J. F. Cullman, Jr.[140] It is a rational inference from the basic facts he knew of the Axton-Transamerica relationship.

A. S. Holding Co. once owned 540 Axton Class A. Transamerica acquired this stock in September 1942.[141] A. S. Holding Co., a Delaware corporation, was an investment holding company for Armond Schmoll;[142] and it dissolved in December 1945.[143] Its assets were distributed in kind; its shares were held by:[144]

| | |
|---|---:|
| Arthur J. Cohen, Executor of the Estate of Armond Schmoll, deceased | 10,827 |
| Eddy & Co. [nominee of Arthur J. Cohen and Bankers Trust Co., Trustees under six inter vivos trusts (DX (T) Nos. 16–21)] | 7,550 |
| Armande Mondolfo | 183 |
| Viviane P. Pardo | 1,000 |
| Mildred Strauss | 100 |
| Jacqueline Schmoll | 200 |
| Clarita Isch-Wall | 140 |

The Cohen & Eddy shares (18,377) are represented here by Cullman Bros., Inc., by means of an assignment.[145] The Mondolfo, Strauss, Schmoll and Isch-Wall shares (623 in all) are not represented in the case at bar. Before A. S. Holding Co. dissolved, Arthur J. Cohen was vice-president and director; he was also senior partner of Wharton's firm until 1945; he together with another made all decisions on purchase and sale of securities; and he personally made the decision to sell the 500 Axton Class A to Transamerica.[146] The Axton stock had been purchased originally on advice of J. F.

129. J. Cullman Dep. II, 34–35; DX Edelstein No. 14.

130. J. Cullman Dep. II, 73–75; 241–242; 80–81.

131. DX J. Cullman No. 4; J. Cullman Dep. I, 1, 5; Id., Dep. II, 70–71.

132. DX J. Cullman Nos. 15, 32; J. Cullman Dep. II, 108–109.

133. J. Cullman Dep. I, 22; DX (T) Nos. 33, 34, 35; DX Wharton No. 31; J. Cullman Dep. II, 139.

134. Klingenstein Dep. 3.

135. DX Cohen No. 1; DX Edelstein No. 16.

136. DX (T) No. 28.

137. Klingenstein Dep. 6; DX (T) No. 38.

138. Klingenstein Dep. 12, 36, 39, 42.

139. J. Cullman Dep. II, 259; Klingenstein Dep. 15; DX (T) No. 45.

140. J. Cullman Dep. II, 260; Klingenstein Dep. 52.

141. DX Cohen No. 1.

142. Cohen Dep. 5, 8.

143. DX (T) No. 23.

144. DX (T) No. 14.

145. DX (T) Nos. 24, 25.

146. Cohen Dep. 5, 4, 10.

Cullman, Jr.,[147] and when Cohen sold the Axton stock he did it on the advice of Cullman,[148] with whom he had friendship for over 50 years.[149]

Cohen also owned T & A stock himself and knew of its ownership of Axton stock.[150] After Cullman resigned from the T & A board, Cohen discussed the Axton situation with Cullman and Wharton and also the correspondence with Giannini;[151] the sale of T & A's stock to Transamerica[152] at above market price.[153] Cohen also read the Court of Appeals' Zahn opinion;[154] and discussed it with Cullman and Wharton.[155] He knew of the pending litigation between Axton and Transamerica, but made no attempt to investigate, depending on Cullman and Wharton for advice.[156]

Plaintiff Viviane P. Pardo was the daughter of Armond Schmoll.[157] She owned 1,000 shares of A. S. Holding Co. in September 1942. Ever since 1940 she relied on Cohen to advise her when to sell.[158]

H. N. Whitney, Goadby & Co. was a brokerage house, owned 80 shares of Axton Class A, and sold them to Transamerica in September, 1942,[159] for the beneficial owners.[160]

Junius A. Richards was a director of T & A from 1941 until its dissolution in 1954.[161] He was present at the directors' meeting of September 25, 1944, when the SEC investigation was discussed.[162] He was aware of the Speed case, and Cullman's report of the October 25, 1944 conference.[163] He then thought "there was certainly something that deserved looking into"[164] but he had "no hunger" for a law suit for his partnership[165] (Whitney, Goadby, etc.). He took no steps to see if his firm had a cause of action.[166] Moreover, the 50 Axton shares registered in White, Weld & Co., acquired by Transamerica in September, 1942, were beneficially owned by Richards' sister (Mrs. Lilian A. Chapin),[167] but she refused to join in the present action.[168]

William A. Sunkenberg owned 30 shares of Axton A stock which Transamerica bought in September 1942.[169] He was employed by Cullman Bros., Inc., from 1939 to 1940.[170] He knew nothing of Cullman meeting Giannini, their correspondence, or any negotiations between T & A and Transamerica.[171] Sunkenberg agreed to sell his stock with T & A, as he relied on Cullman for advice.[172] He was not surprised when invited to join the present action because he was relying on Cullman.[173] He knew of this court's decision in the Speed case in

147. Id., 10.

148. Id., 11.

149. Id., 10, 14.

150. Id., 92–93.

151. Id., 24–25, 41; DX Edelstein No. 14.

152. Id., 28–33; id., No. 14.

153. Id., 13.

154. DX Edelstein No. 51.

155. Id., No. 9; Cohen Dep. 36–38, 51, 59.

156. Cohen Dep. 64–66.

157. Id., 89.

158. Pardo Dep. 129, 127.

159. DX Cohen No. 1; DX Edelstein Nos. 22, 23.

160. DX (T) Nos. 30B, 31A, 31B; Richards Dep. 149–150.

161. Richards Dep. 154.

162. Id., 186.

163. Id., 189–190, 194.

164. Id., 199.

165. Id., 196.

166. Id., 198–199.

167. DX Cohen No. 1; DX Edelstein No. 23.

168. Richards Dep. 166–167.

169. DX Cohen No. 1; DX Edelstein No. 18.

170. Sunkenberg Dep. 3.

171. Id., 11–12.

172. Id., 5–6, 13–14, 21–22.

173. DX Wharton Nos. 26A, 26B; Sunkenberg Dep. 23.

1951[174] and he made no further inquiries.[175]

Solomon W. Schaefer owned 50 shares of Axton Class A which Transamerica bought in September 1942.[176] He was H. Cullman's physician.[177] He bought it on his advice and sold it on the same.[178] He regarded Cullman Brothers as representing him, and he relied especially on H. Cullman without making any independent inquiry.[179]

The Estate of Edythe A. Sartorius owned 90 shares of Class A which Transamerica bought in September 1942.[180] Plaintiff Irving A. Sartorius was co-trustee under the will and sold the shares in such capacity.[181] The shares had been bought for E. A. Sartorius by the Cullmans,[182] and they advised before the shares were sold.[183] I. A. Sartorius assumed the Cullmans would regard him "in the same light as he regarded his other associates and include [him] in any action—sale, purchase, or other activity".[184] He knew nothing about the relations of Axton to Giannini or Transamerica, or of Cullman's activities.[185]

Plaintiffs Helen J. Ford and her husband, Sumner Ford, Esq., owned 50 shares and 100 shares respectively which were bought by Transamerica in September 1942.[186] He handled her financial affairs.[187] She knew the Cullmans but nothing of their relationship to Axton or Transamerica.[188] Her husband had been for 32 years a partner of Breed, Abbott & Morgan.[189] He was attorney for Howard Cullman as to certain personal affairs.[190] He bought his Axton shares at Cullman's suggestion,[191] and sold both his wife's and his own shares on the same basis.[192] He knew nothing of the affairs of Axton or Transamerica or Cullman's dealings with Giannini.[193]

Lilian Riegelman owned 100 Class A which Transamerica bought in September 1942. She died September 18, 1942.[194]

B. I have documented the facts, so far discussed, to the record, in specific detail, to show they are clear and convincing and as such they lead me to examine plaintiffs' long hesitation in instituting the case at bar. T & A and its lawyers seemed to ignore the obvious caveat raised by the SEC investigation after October 1944;[195] and J. F. Cullman, Jr., seems never to have acted on the board of directors authorization to get Senator Hastings' opinion whether T & A had a cause of action against Transamerica.[196] As to the important October 25 conference, J. F. Cullman, Jr. "wasn't particularly interested one way or the other".[197] There was no verification of the facts stated by Frank and Hastings at the conference.[198] No ef-

174. Sunkenberg Dep. 28.

175. Id., 29.

176. DX Cohen No. 1; DX Edelstein No. 21.

177. Schaefer Dep. 37.

178. Id., 40.

179. Id., 49–50, 51, 54–55.

180. DX Cohen No. 1; DX Edelstein Nos. 24, 25.

181. Sartorius Dep. 61, 63.

182. Id., 67.

183. Id., 63.

184. Id., 75.

185. Id., 67, 68, 69, 87–88.

186. DX Cohen No. 1; DX Edelstein Nos. 19, 20.

187. H. Ford Dep. 94.

188. Id., 97–98.

189. S. Ford Dep. 100.

190. Id., 113.

191. Id., 103.

192. Id., 103–104.

193. Id., 106, 107, 108.

194. DX Cohen No. 1; DX Edelstein No. 17; DX (T) No. 42B.

195. J. Cullman Dep. II, 252; Wharton Dep. 262–263.

196. J. Cullman Dep. II, 230–231; Hastings Dep. 18–19.

197. J. Cullman Dep. II, 186.

198. Wharton Dep. 164–167.

fort was made to follow the Speed and Friedman cases;[199] the Zahn appellate decision was given only passing interest;[200] and from 1944 to 1952 no effort was made for a progress report from either Hastings or Frank.[201] If present plaintiffs had made inquiry, Senator Hastings would have given all facts available to him and made available all pre-trial papers if asked to do so.[202] Then on February 21, 1952, Wharton wrote J. F. Cullman, Jr., he believed present plaintiffs had a cause of action "if the case is not barred by the statute of limitations".[203] Clearly all pleadings and pre-trial writings in the related cases were available in this court after the autumn of 1944.[204] Robbins' first deposition was filed here as a public record on June 15, 1946, and the same month affidavits of J. F. Cullman and Nathaniel Glidden were filed.[205] On April 6, 1948, all evidence was a matter of public record. On August 8, 1951, the decision was rendered. The plaintiffs' action was brought almost a year later, over four years after the actual trial, and almost eight years after the related litigation was commenced.[206]

Plaintiffs are barred from maintaining this action. Plaintiffs admit, at the time of the private purchase in Septem-

199. Id., 191, 207–208; Edelstein Dep. 117–118.

200. Cohen Dep. 36; DX Edelstein No. 49, 50.

201. Hastings Dep. 14–15, 19, 58; Frank Dep. 56–58, 66.

202. Hastings Dep. 58–59.

203. DX Wharton No. 26B.

204. DX (T) Nos. 41A, 41B, 41C. Pp. 54–56 of Robbins' Dep.:
"Q. Did Mr. Giannini ever discuss with you the best way of realizing on the increased value of the inventory, and if so when? A. Yes, Senator, there were several discussions on that subject. I recall that the first discussion of what would be best ultimately for the stockholders, that is operation or liquidation in one form or another of the value that had been accumulated in the leaf inventories. The first discussion of that subject occurred in midsummer of 1942 as I recall it, during a visit to San Francisco. I recall that it was of sufficient importance in my mind that I took the occasion to get Mr. L. M. Giannini's consent to change the arrangement that he had made with me to pay me a bonus on profits equal to five per cent of the profits above a certain historical average; from that basis, with the Axton-Fisher Tobacco Company to the basis that I would receive five per cent of the profits that would be made by Transamerica if it should take its profit as a stockholder rather than run the profit through the Axton-Fisher Tobacco Company as an operating profit, and he agreed in the midsummer of 1942 to that arrangement.
* * * * *
"Q. Now, following that suggestion, did you make any effort to dispose of the tobacco, all of the inventory of Axton-Fisher, at any time? A. No, sir. At that time, in the summer of 1942, it was left with Mr. Giannini that it was all right with them for us to go ahead operating the company as though the operation were going to be a permanent thing, rather than to cut off the advertising and the sales expenses and other things you might do if you were of the opinion that it would be wise to go into a process of some form of sale of the profit which you might say the stockholders already had in the bag in the company in the form of the great appreciation of around $10,000,000 in inventory values."

205. DX (T) No. 41B. The Glidden affidavit pointed out:
"Normally, at that time and presently, five points above the market for a block of that size would be rather high and ten points above the market was and would be abnormal. This is especially true in the light of the fact that Axton-Fisher Tobacco Company had a bad history of earnings in the cigarette business. There was nothing in the prior history of this company in the normal conduct of the cigarette business, that justified the premium that was paid for this block of stock. The payment of such a premium by Transamerica Corporation was, therefore, clearly indicative of the fact that Transamerica Corporation expected to profit by the transaction, not through the continuation or normal operations of the cigarette business." (DX Wharton No. 32).

206. It was as a result of my findings in Speed v. Transamerica Corporation, D.C. Del., 99 F.Supp. 808, that plaintiffs were finally moved to institute proceedings. Complaint, par. 36.

ber 1942, they knew of the increased value of Axton's tobacco inventory,[207] a critical fact not shared by the Speed, Friedman and Zahn plaintiffs. Consequently, with respect to that fact, duty of disclosure, would have availed present plaintiffs nothing. Thus, the gravamen of the complaint was limited to defendant's failure to disclose its existing intention to liquidate, the crucial finding in the related cases, and the affirmative misrepresentation of that intention. I find defendant's hidden intent, together with its mere denials of fraud, insufficient to have deluded these plaintiffs. In fact, frequent opportunities were had to detect the fraud. Plaintiffs' assertion that to evaluate the evidence of a complicated lawsuit and draw appropriate inferences of fact denied by defendant would be duplicating the task of a District Judge, is neither realistic nor prohibitive. The facts of active litigation were available for the asking, yet what resulted was massive indifference and inactivity.

The evidence would seem to indicate plaintiffs thought the facts alleged in Speed, Friedman and Zahn were true but, speculating upon the outcome, they hoped for a favorable result upon which to take advantage. However, it is unnecessary to make that determination for had reasonable diligence been exercised, evidence of fraud could have been discovered no later than April 6, 1948, when the presentation of plaintiffs' evidence in the related cases was complete,[208] and possibly even sooner. That the evidence adduced was of no little moment to plaintiffs was indicated by their attempt to place it before the court because the issues in the case at bar were identical, that is, for the purpose of fixing defendant's intent prior to September 1942.[209] Three years having elapsed without in-

---

207. J. Cullman Dep. I, 30.

208. Although the trial was reopened to permit additional testimony and was not closed until the Spring of 1949, the principal allegations and evidentiary matters necessary to acquaint plaintiffs with its cause of action occurred on or before April 6, 1948.

209. Plaintiffs' motion, filed August 31, 1954, read, in part:

"That the Speed case was based upon a letter written by defendant dated November 12, 1942 in which an offer was made to buy the stock of the minority stockholders in Axton-Fisher Tobacco Company for certain prices mentioned in said letter and on certain conditions mentioned in said letter. In the above entitled cause the purchase was made by defendant on September 18, 1942. The issue involved in both cases is whether at the time the purchases were made it was the intention of the defendant, which had controlling interest in Axton-Fisher Tobacco Company, to liquidate said company in order to capture for itself the increased value of the inventory of the latter company.

"In the Speed case the Court was asked to find that prior to November 12, 1942 the defendant's intention was liquidation. The reading of this Court's opinion in the Speed case, however, discloses beyond question that this Court reached the conclusion that liquidation was contemplated by the defendant prior to the purchase of the plaintiffs' stock in the above entitled cause on September 18, 1942. One of the principal issues in the Friedman-Zahn cases was whether defendant intended to liquidate the Axton-Fisher Tobacco Company prior to the calling of the A stock in June, 1943, but the evidence in this case involves the same issue as that involved in the above entitled cause since the defendant in all its testimony insists that there was no thought of liquidation given by defendant until the latter part of the year 1943 and no definite decision was reached until April of 1944."

On December 6, 1954, I decided, Tobacco and Allied Stocks, Inc. v. Transamerica Corporation, D.C., 16 F.R.D. 545, at page 547:

"At the present time, I shall not grant plaintiffs' motion to utilize the depositions in question or pass on questions of their admissibility in the pending cause. If the contents of the 26 or more depositions do show, in fact, there is support for the proposition of identity of issues in the several matters which have been in litigation—obviously there is no identity of parties—; or, if the depositions can be shown to contain evidence relevant to the limitations, laches and other issues concerning the affirmative defenses, plaintiffs should be permitted to make a preliminary examination of the depositions, to utilize such depositions for the limited

stitution of suit, plaintiffs are barred by the Delaware statute of limitations. Plaintiffs are also barred by laches. I find the period from April 6, 1948 until July 10, 1952 was one of inexcusable delay. Coupled with such prejudice resulting to defendant as here described,[210] this lapse of time before coming to Court makes it inequitable for plaintiffs to maintain this cause further.

purposes stated. The ruling, therefore, is plaintiffs will be allowed to examine all depositions in the other Transamerica cases, but before any of such material can be admissible, plaintiffs' counsel must point out with specificity what evidence shows intent of Transamerica to capture the Axton-Fisher inventory by merging or dissolving Axton-Fisher prior to September, 1942."

210. "In all cases where actual fraud is not made out, but the imputation rests upon conjecture, where the seal of death has closed the lips of those whose character is involved, and lapse of time has impaired the recollection of transactions and obscured their details, the welfare of society demands the rigid enforcement of the rule of diligence." Hammond v. Hopkins, 143 U.S. 224, 274, 12 S.Ct. 418, 435, 36 L.Ed. 134.