435 F.2d 1223
 William F. deHAAS et al., Plaintiffs-Appellees,
v.
EMPIRE PETROLEUM COMPANY, a Colorado corporation, Eugene M. Stone, Empire Crude Oil Company, a Nevada corporation, and American Industries, Inc., a Nevada corporation, Defendants-Appellants.
 No. 22-70.
 United States Court of Appeals, Tenth Circuit.
 December 22, 1970.
 Rehearings Denied February 10, 1971.
 
 Holmes Baldridge, Denver, Colo. (Arlen S. Ambrose, Denver, Colo., was with him on the brief) for defendants-appellants.
 James W. Heyer, Denver, Colo., for plaintiffs-appellees.
 Before LEWIS, Chief Judge, and SETH and HICKEY*, Circuit Judges.
 LEWIS, Chief Judge.
 
 
 1
 This is a multiple claim stockholders' derivative action brought by plaintiff deHaas as a stockholder of American Industries, Inc., seeking damages and equitable relief against defendants for violations of Rule 10b-5 promulgated by the Securities and Exchange Commission pursuant to section 10(b) of the Securities Exchange Act of 1934. After trial before court and jury in the United States District Court for the District of Colorado two claims survived to judgments in favor of plaintiff totalling $60,000 against defendants Empire Petroleum and Stone and an additional $5,000 against Stone as punitive damage. Defendants do not now question the sufficiency of the evidence to support the findings of fraudulent violation of section 10(b) of the Act; nor do they specifically seek a new trial. Consequently we need not recite in full the complexities of this protracted litigation nor its complete evidentiary background.[1] Defendants have limited the appellate issues to contentions that:
 
 
 2
 1. Plaintiff's claims were barred by the applicable statute of limitations.
 
 
 3
 2. Plaintiff was never a shareholder in American.
 
 
 4
 3. Plaintiff failed to make a demand upon American's board of directors to institute suit prior to his bringing this action.
 
 
 5
 4. The court erred in allowing an amendment to the complaint at the close of all evidence and further erred in submitting such alleged new claim through a prejudicial form of verdict.
 
 
 6
 5. The court erred in allowing punitive damage against defendant Stone.
 
 
 7
 Consideration of these contentions does require a particularization of the evidence in varying extents and in projection from the broad background of the case.
 
 
 8
 In early 1962, defendant Empire Petroleum Company was the sole owner of Mutual Supply Company and American Industries, Inc. Empire also owned 43 percent of the stock in Inland Development Corp. with the rest distributed among 1400 public stockholders. Both of the wholly-owned subsidiaries were apparently in serious financial trouble and had negligible assets. Inland Development Corp., on the other hand, owned assets worth approximately one million dollars.
 
 
 9
 Defendant Stone held important ownership interests and management offices in all the corporations involved, and was in a position to dominate all of these companies.
 
 
 10
 During June and July of 1962, Empire sold Mutual to American and then a merger between Inland and American was consummated, with American as the survivor. American subsequently lost over $318,000 during the next three years in attempting to operate Mutual.
 
 
 11
 The consent of Inland's public stockholders to the 1962 merger was obtained through the use of proxy solicitations which failed to disclose, among other things, that American had issued $259,000 in interest-bearing notes to Empire in payment for Mutual, that Mutual was a losing operation, and that Inland's assets were expected to pay off the substantial debts of Mutual.
 
 
 12
 The $259,000 in notes, representing the purchase price of Mutual, was canceled prior to trial.
 
 I. Statute of Limitations
 
 13
 This issue was considered by both court and jury, the court determining the actions to be not barred as a matter of law, 286 F.Supp. 809, 813, and the jury specifically finding, under proper instructions, that the action was not barred in fact. We hold the record to support both determinations.
 
 
 14
 There is no federal statute of limitations applicable to actions brought under section 10(b) of the Securities Exchange Act of 1934. Hence, the limitations statute of the forum state in which the alleged prohibited acts occurred applies to a private suit for damages under section 10(b). Hooper v. Mountain States Securities Corp., 5 Cir., 282 F.2d 195, 205. In the instant case it is agreed that the Colorado statute of limitation for fraud, C.R.S.1963, 87-1-10, should apply. This statute requires that suit be brought within three years after discovery of fraud by the aggrieved party. See Trussell v. United Underwriters, Ltd., D.Colo., 228 F.Supp. 757, 775-776.
 
 
 15
 Plaintiff concedes that this suit was not brought within three years after the 1962 merger[2] but contends that the statute of limitations was tolled until 1965 because he did not know about, nor could he reasonably have discovered, the fraud. Defendant, on the other hand, argues that at the time of the 1962 merger plaintiff knew, or by the exercise of due diligence, could have discovered the fraudulent nature of the merger.
 
 
 16
 Although the limitation period is supplied by the state of Colorado, "it is a matter of federal law as to the circumstances that will toll a state statute applied to private actions under the securities laws." Esplin v. Hirschi, 10 Cir., 402 F.2d 94, 103. The federal doctrine of tolling as applied to fraud actions was enunciated by the Supreme Court in the early case of Bailey v. Glover, 88 U. S. 342, (21 Wall.) 22 L.Ed. 636, 638: "[W]here the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party." This equitable doctrine has been consistently applied in private fraud actions under section 10(b) of the Securities Exchange Act.[3] See Esplin v. Hirschi, supra, 402 F.2d at 103; Hooper v. Mountain States Securities Corp., supra, 282 F.2d at 206.
 
 
 17
 Several cases since Bailey have attempted to clarify what quantum of knowledge the plaintiff must possess in order to set the statute of limitations running. The analysis in Tobacco & Allied Stocks, Inc. v. Transamerica Corp., D.Del., 143 F.Supp. 323, 331, affd., 244 F.2d 902, 3 Cir., correctly sums up applicable law:
 
 
 18
 It is impossible to lay down any general rule as to the amount of evidence or number or nature of evidential facts admitting discovery of fraud. But, facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud. Facts in the latter sense merely constitute objects of direct experience and, as such, may comprise rumors or vague charges if of sufficient substance to arouse suspicion. Thus, the duty of reasonable diligence is an obligation imposed by law solely under the peculiar circumstances of each case, including existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings.
 
 
 19
 In accord with this standard we need only concern ourselves with the information plaintiff had prior to March 23, 1963, which is three years prior to filing of this suit. Only if plaintiff had sufficient notice before that date, will the statute of limitations be a bar. The most directly relevant information then available to plaintiff was the proxy material sent to him in relation to the merger between Inland and American. This consisted of a letter signed by defendant Stone and mailed to Inland's stockholders giving some explanation of the proposed merger, a copy of the merger agreement, and a proxy card. This material, taken alone, was clearly inadequate to have aroused a reasonable suspicion. No disclosure was made of the financial condition of either company, and although the previous sale of Mutual to American was mentioned, no details were given. In addition, defendant falsely stated in the letter that Mutual was operating a service station in the Denver area when he knew that this enterprise had recently been abandoned.
 
 
 20
 The other major source of information was the 1961 Empire Annual Report, which was sent to plaintiff as a stockholder of Empire. Note 3B of that report states that Empire's investment in American had been reduced on the basis of appraisal to $34,800. From this plaintiff could have inferred that American was virtually a "shell" corporation, at least before its subsequent purchase of Mutual. The report also listed several commitments Empire had made to guarantee certain long-term debts of Mutual. From this, plaintiff could have inferred that American might be "stuck" with paying these debts if Mutual defaulted. However, in light of the glowing letter recommending the American-Inland merger, plaintiff could reasonably be led to believe that Mutual was making money and could pay its debts.
 
 
 21
 Defendants additionally stress plaintiff's past connections with the oil business and Empire, his continuing interest as a stockholder, and his admitted concern over the merger of Inland and American. Although plaintiff had been sales manager, officer, and director of Empire, he left the company in 1957 and has not been significantly associated with it since then except as a stockholder. As a stockholder of Empire and Inland, plaintiff received the normal operating reports mailed by the two companies, which he studied and retained. We have already detailed the information contained in this material that was relevant to the 1962 merger. Plaintiff's testimony does indicate that he had some doubt about the 1962 merger, but a close examination shows only a feeling that the merger would accomplish little, if anything, and a subjective hesitation as to whether it was good business practice.
 
 
 22
 In assessing the reasonableness of plaintiff's failure to investigate, we should also consider that the officers and directors of a corporation occupy a fiduciary relationship in regard to the stockholders. See Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281. Stockholders' reliance is to be expected. Under our corporate system most stockholders are mere investors and cannot hope to stay informed on the details of management. Since the reports sent to stockholders necessarily give only a summarized view of the situation, questions and doubts are bound to arise concerning corporate actions. When this occurs it is reasonable for a stockholder to rely on the knowledge and integrity of the corporate managers, but such reliance cannot be absolute.
 
 
 23
 We hold that the evidence does not conclusively demonstrate that plaintiff knew or reasonably should have known of the fraud prior to March 23, 1963. At the very most, the evidence raises a factual issue, and since it was properly given to the jury and decided adverse to defendants, the jury's determination is binding. See Schillner v. H. Vaughan Clarke & Co., 2 Cir., 134 F.2d 875.
 
 II. Plaintiff's Standing as a Shareholder
 
 24
 Fed.R.Civ.P. 23.1 states the prerequisites that plaintiff must comply with to bring a derivative action. Rule 23.1(1) requires that plaintiff be "a shareholder or member at the time of the transaction of which he complains or that his share or membership thereafter devolved on him by operation of law * * *." Although the rule does not expressly state that plaintiff must be a shareholder or member at the time the suit is brought, it does imply that since it deals with actions brought by "one or more shareholders or members."
 
 
 25
 It appears that plaintiff has never been a record shareholder of American because he failed to exchange his Inland stock for American stock pursuant to the 1962 merger agreement. That plaintiff could at any time demand issuance of American stock in exchange for his Inland shares is not disputed, however. Thus, plaintiff was at least an equitable owner of American stock.
 
 
 26
 In the case at bar, we consider plaintiff's stock interest to be the practical equivalent of record stock and sufficient to satisfy the requirements of Rule 23.1(1). Our conclusion is in conformity with the general federal rule and that of a majority of states. See H. F. G. Co. v. Pioneer Pub. Co., 7 Cir., 162 F.2d 536; 2 W. Barron & A. Holtzoff, Federal Practice and Procedure § 566 (1961 ed.).
 
 III. Demand
 
 27
 Included among the requirements for pleading a derivative action under Rule 23.1 is the necessity of setting forth the efforts of the plaintiff, or the reasons for making no effort, to obtain intracorporate relief for the action he desires. In the case at bar, plaintiff admittedly made no effort to approach the directors but did set forth reasons for not so doing. The allegations may, of course, become the subject of factual dispute (as here) but the issue remains one for the court and its determination lies within the sound discretion of the court. Courts have generally been lenient in excusing demand. See Meltzer v. Atlantic Research Corp., 4 Cir., 330 F.2d 946.
 
 
 28
 The trial court here held, prior to trial, that a derivative action was the only effective method of litigating plaintiff's claims and that demand was excused. We are in complete accord with this ruling for the reasons set forth in the trial court's memorandum decision, 286 F.Supp. 809, 813-815, and we find nothing in the trial record that would indicate an abuse of discretion.
 
 IV. The Amendment to the Complaint
 
 29
 Defendants next contend that the trial court abused its discretion by allowing an amendment to the complaint to be made after the close of all evidence. The amendment relates to plaintiff's First Claim, which was based on a rather extensive statement of allegations. Basically, however, plaintiff charged defendants with a scheme to defraud the stockholders of American by soliciting proxies for the approval of a merger between American and Inland without disclosing certain material facts, all of which was in violation of Rule 10b-5. Among the material facts that plaintiff claimed defendants had not disclosed were that American had recently purchased Mutual from Empire for $259,000, that Mutual had never made a profit, that Mutual was suffering continuous and substantial losses, that the purpose of transferring Mutual was to relieve Empire of these losses, and that Inland's assets would be used to pay Mutual's debt.
 
 
 30
 These statements in the body of the complaint were clearly adequate to base a claim for damages upon the losses American suffered in running Mutual. In the subsequent prayer for relief, however, no such claim for damages was presented. Instead, plaintiff based his claim on the purchase price of Mutual, asking for $259,000 compensatory damages or, in the alternative, for the cancellation of the indebtedness owed by American to Empire in connection with the Mutual purchase.
 
 
 31
 During the trial it was discovered that the indebtedness, representing the purchase price of Mutual, had already been canceled. Subsequently the court allowed plaintiff to abandon a claim for damages based on the purchase price of Mutual and to assert one for damages based on the losses sustained by American in operating Mutual. The jury returned a verdict of $10,000 on the First Claim and the court, after reconsidering the matter, upheld the amendment. The reasons given by the court for allowing the amendment are essentially that the allegations of the complaint described quite adequately the losses suffered by American in running Mutual and that the evidence thoroughly explored into these losses and into the transactions connected with them.
 
 Fed.R.Civ.P. 15(b) provides:
 
 32
 When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time * * *.
 
 
 33
 The test for allowing an amendment under Rule 15(b) to conform pleadings to issues impliedly tried is whether the opposing party "would be prejudiced by the implied amendment, i. e., whether he had a fair opportunity to defend and whether he could offer any additional evidence if the case were to be retried on a different theory." 3 J. Moore, Federal Practice ¶ 15.13[2], at 993 (2d ed. 1966). See, e. g., Monod v. Futura, Inc., 10 Cir., 415 F.2d 1170, 1174; Lomartira v. American Auto. Ins. Co., 2 Cir., 371 F.2d 550, 552.
 
 
 34
 Applying the above test to the circumstances of the instant case, we conclude that there was no abuse of discretion in granting the amendment. The question of Mutual's operating losses had always constituted a large part of plaintiff's cause of action, even prior to the contested amendment. The basic issues connected with the First Claim were whether the losses suffered by American in managing Mutual were expected by the defendants, whether there was a fraudulent scheme to shift these losses away from Empire via the sale of Mutual to American and the merger of American and Inland, and whether there was a nondisclosure of these material facts to the public stockholders of Inland.
 
 
 35
 The record reveals that the plaintiff presented substantial evidence on the losses suffered by American in running Mutual and that defendant had an ample opportunity to rebut such evidence within the context of the above issues.
 
 
 36
 Defendants complain, however, because the evidence on losses was not introduced directly on the issue of damages. The fact of operating loss through Mutual is, however, not disputed and the only other element necessary to prove the amended theory of damages was the connection of these losses to the fraudulent merger of 1962. This latter issue was contained in the evidence which tended to show that the losses suffered after the merger were inevitable and that the defendants knew this at the time of the merger and were actually attempting to shift the anticipated losses from Empire to American and Inland. Although this evidence was introduced on the issue of whether information concerning the anticipated losses should have been disclosed in the proxy materials for the 1962 merger and not on the issue of damages, the defendants do not suggest and we are unable to conceive of any additional evidence they might have presented in rebuttal.
 
 
 37
 Defendants further complain that they were prejudiced by the court's submission to the jury of a verdict sheet containing the misleading caption, "Verdict — First Claim — The Merger of Inland and American." Since no damages were ever sought as a result of the Inland-American merger per se but only on situations resulting from or related to such merger, defendants contend that the caption on the verdict sheet could only serve to confuse the jury. We find no merit to this contention. The jury was specifically instructed on the requirements necessary to allow recovery on the First Claim and the verdict's caption was no more than generally descriptive of the claim in contrast to other claims submitted to the jury.
 
 V. Punitive Damages
 
 38
 As we have indicated, the jury awarded $5,000 punitive damages against the defendant Stone. The trial court upheld the award, 302 F.Supp. 647, thus apparently premising a conflict between district courts within the circuit. See Reynolds v. Texas Gulf Sulphur Co., D.Utah, 309 F.Supp. 548. Other courts are not in agreement as to whether punitive damages are allowable in civil action implied under the general anti-fraud provisions of Rule 10b-5.[4] Opposing punitive damages have been Globus v. Law Research Serv., Inc., 2 Cir., 418 F.2d 1276, cert. denied, 397 U. S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93; Baumel v. Rosen, 4 Cir., 412 F.2d 571, 576 (dictum), cert. denied, 396 U.S. 1037, 90 S.Ct. 681, 688, 24 L.Ed.2d 681; Green v. Wolf Corp., 2 Cir., 406 F.2d 291, 302-303, cert. denied, Troster, Singer & Co. v. Green, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766; Myzel v. Fields, 8 Cir., 386 F.2d 718, 748 (dictum), cert. denied, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143; Pappas v. Moss, D.N.J., 257 F.Supp. 345, 364, rev'd on other grounds, 3 Cir., 393 F.2d 865; Mills v. Sarjem Corp., D.N.J., 133 F.Supp. 753, 770. Allowing punitive damages have been Hecht v. Harris, Upham & Co., N. D.Cal., 283 F.Supp. 417, 444-445 (dictum); Nagel v. Prescott & Co., N.D. Ohio, 36 F.R.D. 445, 449 (dictum). In addition, numerous commentators have written on the subject. See, e. g., Coffey, Post-Acquisition Relief, The Review of Securities Regulation, Vol. 3, No. 11, pp. 907-11 (1970); Ruder, Damages in Securities Cases, The Review of Securities Regulation, Vol. 2, No. 20, pp. 817-21 (1969); Comment, Punitive Damages in Implied Private Actions for Fraud Under the Securities Laws, 55 Cornell L.Rev. 646 (1970).
 
 
 39
 Neither the express wording of the Securities Exchange Act of 1934 nor the congressional history offer any real solution. Section 28(a) limits recovery "under the provisions of this chapter" to "actual damages." Some courts argue that this section limits recovery in an implied action under Rule 10b-5. See, e. g., Green v. Wolf Corp., supra, 406 F.2d at 302-303. Others conclude that "under the provisions of this chapter" refers only to actions expressly created by the Act and not to implied remedies. See, e. g., Hecht v. Harris, Upham & Co., supra, 283 F.Supp. at 444-445. There is a further argument that section 28(a) was intended solely to prevent "double recovery" by plaintiffs bringing separate actions for state common-law fraud and for violation of federal law. See 3 L. Loss, Securities Regulation 1474, 1624, 1793-94 (2d ed. 1961). The legislative history offers nothing additional, the relevant passage reading: "This subsection reserves rights and remedies existing outside of those provided in the act, but limits the total amount recoverable to the amount of actual damages." H.R.Rep.No.1383, 73rd Cong., 2d Sess. 28 (1934). Absent a clear answer from the Act itself, we must base our holding upon an analysis of the policies underlying the securities laws and the awarding of punitive damages.
 
 
 40
 Punitive damages serve the purposes of deterrence and retribution against the individual defendant and in addition provide an incentive for individuals to bring private actions when public officials cannot effectively police the field. See W. Prosser, Torts § 2, at 9-11 (3d ed. 1964). This latter point could be especially important since private enforcement of the security laws is necessary due to the limited resources of the SEC. See, e. g., Bernfeld, Class Actions and Federal Securities Laws, 55 Cornell L. Rev. 78 (1969). Although enforcement of the security laws would obviously be strengthened to some extent by the addition of punitive damages, the question is whether the benefits outweigh the potential problems.
 
 
 41
 Arguments have been made that the available means of enforcement are already adequate. See Globus v. Law Research Serv., Inc., supra, 418 F.2d at 1285. Any person who knowingly and willfully violates the antifraud provisions of the 1934 Act is subject to a maximum fine of $10,000 and/or two years in prison. 15 U.S.C. § 78ff(a). Furthermore, there is the threat of suspension of registrations, suspension of trading, or expulsion from a national securities exchange. 15 U.S.C. §§ 78o(b) (5)-(7), 78s(a). Besides these express deterrents, there is the nebulous social stigma of being branded a knowing violator of the law.
 
 
 42
 Perhaps the most important strengthening of securities laws enforcement has occurred with the liberalization of the class action under the revised Fed.R. Civ.P. 23. Individuals who could otherwise not afford to litigate their small claims separately can now join together, sharing expenses under the more available class action device.[5] The same principle also applies to the use of the derivative action since stockholders who have established a violation of the securities laws by their corporation and its officials are entitled to be reimbursed by the corporation or its survivor for the costs, including reasonable attorneys' fees, of establishing the violation. See Mills v. Electric Auto-Lite, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593. Since these procedural devices allow many small claims to be litigated in the same action, the overall size of compensatory damages alone may constitute a significant deterrent.
 
 
 43
 Whether this arsenal of enforcement is actually so effective as to preclude the need for punitive damages has been ably challenged by some commentators. See, e. g., 55 Cornell L.Rev. 646 (1970). But clearly the remedies existing under the securities laws can be described as potent.
 
 
 44
 In addition to the doubt as to whether punitive damages would significantly increase the deterrent power of securities law enforcement, we should also consider whether allowing such damages might create unwarranted problems and injustices. The Second Circuit has expressed concern that juries could award excessive punitive damages for a single transgression, which might severely injure or even bankrupt an otherwise honest defendant. See Globus v. Law Research Serv., Inc., supra, 418 F.2d at 1285. Traditionally judicial controls over verdicts would, in theory, prevent such an occurrence, but post-verdict procedures are but a method of admitting the existence of initial failure in the administration of justice.
 
 
 45
 It is also argued that punitive damages are inappropriate, at least as used against publicly owned corporations, because the burden would ultimately fall on innocent stockholders. See Green v. Wolf Corp., supra, 406 F.2d at 303. This may be adequate justification for denying punitive damages against public corporations, but the argument is not valid when an individual defendant is involved, as in the instant case.
 
 
 46
 A more serious hurdle than the above problems is how to control the overall burden of punitive damages against a single defendant for a securities fraud violation when claims may be brought in more than one court. If juries in several lawsuits are able to assess punitive damages against the same defendant for the same transaction, there is a danger of overkill.
 
 
 47
 All actions under Rule 10b-5 must be brought in the federal courts, 15 U.S.C. § 78aa, and thus there is the possibility that pending actions may be consolidated in a central district pursuant to 28 U.S. C. § 1404(a) and that all potential claims will be litigated in a single trial by means of the class action or derivative suit. These procedural devices may not always be appropriate, however, and there is no chance of attaining a single federal forum for actions that may be brought in the state courts under section 17(a) of the Securities Act of 1933 and for common-law fraud. 15 U.S.C. § 77v.
 
 
 48
 In dealing with possible multiple actions, it does not seem fair or practicable to limit punitive recoveries to an indeterminate number of first-comers, leaving it to some unascertained court to set the limit. See Roginsky v. Richardson-Merrell, Inc., 2 Cir., 378 F.2d 832, 839. As an alternative, it has been suggested that only the first jury should award punitive damages and that such damages should be paid into an escrow fund for the benefit of all plaintiffs who prove their claims within the period of the statute of limitations. See 55 Cornell L.Rev. at 657. This unprecedented theory is little more than academically interesting.
 
 
 49
 Considering the potential problems involved in allowing punitive damages measured against the doubtful improvement in the enforcement of the securities laws, we have concluded that punitive damages should not be allowed in a private action under Rule 10b-5.
 
 
 50
 The case is remanded to the district court with directions to vacate the judgment against defendant Stone for punitive damages and is in all other respects affirmed.
 
 
 
 Notes:
 
 
 *
 Judge Hickey, since deceased, heard the arguments in this case but did not participate in this decision
 
 
 [1]
 In each regard see 286 F.Supp. 809; 300 F.Supp. 834; 302 F.Supp. 647
 
 
 [2]
 All of the claims submitted to the jury involved transactions occurring between January 29 and July 31, 1962. Suit on these claims was not brought until March 23, 1966
 
 
 [3]
 The court below erroneously relied upon Colorado law in determining that the statute of limitations was tolled but since we reach the same conclusion applying federal law, we hold that this was harmless error
 
 
 [4]
 We shall also consider the issue in relation to section 17(a) of the Securities Act of 1933 since the courts have generally "endeavored to treat the '33 and '34 Actsin pari materia and to construe them as a single comprehensive scheme of regulation." Globus v. Law Research Serv., Inc., 2 Cir., 418 F.2d 1276, 1286. And we approach the problem in the firm belief that it would be most undesirable to establish a rule that would have less than broad application. An ad hoc consideration of the varying types of cases springing from Rule 10b-5 would lead to great and predictable confusion in the law.
 
 
 [5]
 This statement must be qualifiedSee, Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed. 319.