Reuben E. **MAINE**, Plaintiff,

v.

George S. **LEONARD** et al., Defendants.

Civ. A. No. 72–C–26–C.

United States District Court,
W. D. Virginia,
Charlottesville Division.

Oct. 15, 1973.

John C. Lowe, and Stuart F. Carwile, Charlottesville, Va., for plaintiff.

T. Munford Boyd, Forbes R. Reback, Richmond & Fishburne, D. B. Marshall, Paxson, Marshall & Smith, Stephen H. Helvin, Haugh & Helvin, Charlottesville, Va., for defendants.

OPINION

DALTON, Chief. Judge.

### MEMORANDUM OF FINDINGS OF FACT AND CONCLUSIONS OF LAW ON STATUTE OF LIMITATIONS

This court in its ruling in Maine v. Leonard, D.C., 353 F.Supp. 968 (1973) determined that the two-year statute of limitations outlined in the "blue sky" provisions, §§ 13.1–520 and 13.1–522 of the Virginia Code (1973 Repl. Vol.) apply to the action in this case for damages sought pursuant to 15 U.S.C. § 78j (§ 10 of the Securities and Exchange Act of 1934) and Rule 10b-5 thereunder (17 C.F.R. § 240.10b-5). Essentially, plaintiff has alleged that when he sold 8,900 shares of Electric Concepts, Incorporated (ECI) stock to defendants through the brokerage firm of Auchincloss, Parker and Redpath on June 13, 1967, the defendants failed to disclose that there was an impending purchase of ECI by Automatic Sprinkler Corporation of America and also failed to disclose that ECI had been awarded a substantial contract from the United States Army. The stock was sold at two dollars a share, rose in value to four dollars per share within three weeks of the sale, and within six months of June 21, 1967, had risen to seven dollars per share. At present, it is worth substantially less. Plaintiff seeks $100,000 compensatory damages for the defendants' failure to disclose "inside information" and for loss of profits and income from the 8,900 shares of ECI stock.

Defendant George Leonard, purchaser of half of plaintiff's stock, has filed a counterclaim for rescission and damages, seeking rescission of the sale to him of the 4,450 shares of ECI stock and damages suffered because of the difference in the price he paid and the "fair market value" at the time of the purchase (Leonard contends that the fair market value was lessened by the alleged actions of plaintiff Maine in destroying equipment and prototypes belonging to ECI, of which Maine was an officer, and that knowledge of such constituted "insider" information).

This case as it stands now is before the court for findings of fact and conclusions of law on the statute of limitations question. Counsel for all parties have agreed that they neither want nor need any further opportunity to present additional facts on this issue, and have stipulated that this court shall resolve any factual disputes. The court has before it depositions of the principals taken on March 26, 1973, and counsel have filed extensive memoranda on the statute of limitations question.

## FINDINGS OF FACT

Prior to the sale in question, plaintiff had held the position of Executive Vice-President and Chief Engineer of ECI, but left ECI in late March or early April of 1967 to form Virginia Navigation Corporation with other engineers and technicians from ECI. Thereafter, plaintiff desired to sell some 8,900 shares of ECI stock, the value of which, in his own estimation, was very low. (Maine Dep. 83). Defendant Smith was at the time of the sale counsel for ECI, and defendant Leonard had represented the president of ECI in a suit brought by Sperry Rand Corporation in the spring of 1967.

On June 13, 1967, an agreement of sale was reached (defendant Craig of Auchincloss, Parker and Redpath acting as broker), whereby Maine would sell the stock without knowledge of the purchasers' identity and would receive letters from the purchasers indemnifying him in case of any action arising from the sale. Because of his status as a possible insider, and his knowledge of Rule 10b-5, Maine wanted these indemnification letters as proof of full disclosure by him concerning the unregistered nature of the stock and the position of the company. (Maine Dep. 125). The stock was restricted, and could not be sold on the open market. (Maine Dep. 201). These letters were signed by Smith and Leonard on June 14, 1967, and deposited with Auchincloss, Parker and Redpath. On this date, Craig wrote Richard H. Barrick, then attorney for Maine, and confirmed that the letters were in his files and that they would be released if it should become necessary to protect Maine, upon a proper showing of such need. (Craig Dep. 54–56). Maine stated that he was fully aware that the names of the purchasers would not be revealed unless necessary to protect him. (Maine Dep. 134, 198).

Craig bought some of the ECI stock purchased from Maine, at approximately the time it was purchased by Smith and Leonard. (Craig Dep. 51–53).

On July 25, 1967, it was announced in the *Charlottesville Daily Progress* that Automatic Sprinkler Corporation of America (hereinafter called Automatic Sprinkler) had purchased the assets of ECI. Maine alleged that he had no knowledge of such purchase until he read this newspaper article shortly after publication. (Maine Dep. 138). He stated that the close proximity of this merger with the purchase of his stock created suspicion in his mind that the purchase may have been made by insiders (Maine Dep. 130, 138), and that announcement of the merger led him to believe that he had been defrauded. (Maine Dep. 141). Maine made no attempt at that time to inquire into the situation. Approximately eighteen months elapsed after July 25, 1967, during which time Maine made no inquiry.

In August of 1968, Maine was made a third-party defendant in a suit by Automatic Sprinkler against the Insurance

Company of North America. He stated that at this time his original suspicions were increased because of ECI's alleged persistence in making what Maine considered unfounded claims. (Maine Dep. 128, 130, 140–141). On February 20, 1969, Maine wrote Auchincloss, Parker and Redpath (to the attention of Mr. Craig), requesting that he be given the names of the purchasers. He gave no reasons nor did he state any need. (Maine Dep. 134). On February 25, 1969, Craig replied, refusing Maine's request. (Maine Dep. 129, 135).

Craig suspected from this inquiry that Maine was trying to recover the stock, because it had gone up in value. Craig testified that he was under a continuing obligation of nondisclosure of the purchasers' identity as part of the original terms of sale. (Craig Dep. 50). Though by this time Smith was anxious to avoid disclosure because of the spectre of Rule 10b-5, he did not specifically discuss this with Craig. (Smith Dep. 30–31).

Between 1969 and May of 1971, Maine made no further requests of Craig or anyone else connected with Auchincloss, Parker and Redpath, nor did he seek any alternative means of gaining the information. (Maine Dep. 135).

On May 12, 1971, Stuart Carwile, then attorney for Maine, requested from Craig the names of the purchasers. Carwile stated no specific reasons for the request. (Maine Dep. 200). On May 31, 1971, Craig replied, refusing Carwile's request. Carwile wrote again on May 18, 1971, requesting disclosure. On December 3, 1971, Lou Costello, also then attorney for Maine, apparently wrote Craig requesting the names. (Craig Dep. 65). On March 20, 1972, suit was filed by Maine against Craig and Auchincloss, Parker and Redpath. Immediately thereupon, Smith revealed the names of the purchasers to Costello and the letters were released. (Maine Dep. 136). Maine first learned the identities of Leonard and Smith as purchasers of his stock after April 1, 1972. (Maine Dep. 127). The suit of March 20, 1972, was later dismissed. The present action was filed May 31, 1972.

## CONCLUSIONS OF LAW

■ In a situation involving alleged fraud in which relief asked for is based on the Securities Exchange Act of 1934, § 10(b) and S.E.C. Rule 10b-5, it is settled that the state law of the forum will determine the applicable statute of limitations, while federal law will determine when the applicable statute begins to run. Vanderboom v. Sexton, 422 F.2d 1233, 1240 (8th Cir. 1970), (citing Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946)), cert. denied, 400 U.S. 852, 91 S.Ct. 47, 27 L.Ed.2d 90 (1970); deHaas v. Empire Petroleum Company, 435 F.2d 1223 (10th Cir. 1970), rehearing denied, (10th Cir. 1971). See also Bromberg, Securities Laws, Fraud, S.E.C. Rule 10b-5, Vol. II, § 8.4(653) (1972).

■ Federal law since the case of Bailey v. Glover, 88 U.S. 342, 21 Wall 342, 22 L.Ed. 636 (1875) has been that in cases involving elements of fraud that a statute of limitations can be said to begin to run when the fraud is, or upon reasonable inquiry and due diligence should have been discovered. Vanderboom v. Sexton, supra, 422 F.2d at 1240. Tobacco and Allied Stocks, Inc. v. Transamerica Corp., 143 F.Supp. 323 (D.Del. 1956), aff'd, 244 F.2d 902 (3rd Cir. 1957), rehearing denied, (3rd Cir. 1957). The limitation period would not commence to run on the date of contract of sale, but rather on the date that the illegal action was or should have been discovered. See Batchelor v. Legg & Co., 52 F.R.D. 553, 558 (D.Md.1971).

■ The question before this court, then, is whether plaintiff filed this action within two years of the time when he discovered the alleged fraud, or in reasonable diligence should have discovered it. If this court finds that in the exercise of reasonable diligence, plaintiff should have discovered the alleged fraud two years before May 31, 1972, the date his complaint was filed, then it is time

barred. What comprises the duty of reasonable diligence is determined by the peculiar circumstances of each case. deHaas v. Empire Petroleum Company, *supra*, 435 F.2d at 1226.

Some of the elements of reasonable diligence have been distilled in opinions by other federal courts. The case of Clement A. Evans & Co. v. McAlpine, 434 F.2d 100 (5th Cir. 1970), cert. denied, 402 U.S. 988, 91 S.Ct. 1660, 29 L.Ed.2d 153 (1971), rehearing denied, 404 U.S. 874, 92 S.Ct. 26, 30 L.Ed.2d 120 (1971), involved a suit by a stock brokerage firm against several defendants who allegedly created a false facade of financial responsibility for defendant McAlpine, thereby allowing him to trade a large volume of securities with the plaintiff. McAlpine purchased stock from the plaintiff with personal checks, some of which were dishonored for insufficient funds, yet plaintiff continued for some time to trade with McAlpine when normally such irregularities required that the customer's account be "frozen" for ninety days. After five checks were returned, plaintiff stopped trading and instituted an investigation which disclosed the fraud. The trial court found that the plaintiff had failed to exercise reasonable diligence to discover the fraud, and the suit for civil damages pursuant to Rule 10b-5 was thus barred. Plaintiff objected to an instruction given in the district court which set out criteria for determining due diligence, paraphrasing language from Tobacco & Allied Stocks, Inc. v. Transamerica Corp., *supra*, 143 F.Supp., at 331, which stated in part.

. . . it is impossible to lay down any general rule as to the amount of evidence or number or nature of evidential facts admitting discovery of fraud. But, facts in the sense of indisputable proof or any proof at all, are different from facts calculated to excite inquiry which impose a duty of reasonable diligence and which, if pursued, would disclose the fraud. Facts calculated to excite inquiry merely constitute objects of direct experience and, as such, may comprise rumors

or vague charges if of sufficient substance to arouse suspicion. Thus, the duty of reasonable diligence is an obligation imposed by law solely under the peculiar circumstances of each case, including existence of a fiduciary relationship, concealment of the fraud, opportunity to detect it, position in the industry, sophistication and expertise in the financial community, and knowledge of related proceedings.

The Court of Appeals accepted the instruction as given and upheld the verdict of the trial court. Other courts have utilized similar standards in clarifying what quantum of knowledge the plaintiff must possess to set the statute of limitations running. *See* deHaas v. Empire Petroleum Company, *supra*, 435 F.2d, at 1226–1227; Morgan v. Koch, 419 F.2d 993, 997–999 (7th Cir. 1969), rehearing denied, (7th Cir. 1969); Tobacco and Allied Stocks, Inc. v. Transamerica Corp., *supra*, 143 F.Supp., at 331.

The court in Morgan v. Koch, *supra*, held that a plaintiff in a 10b-5 case has the duty to make diligent efforts to seek out facts which would disclose fraud, including taking notice of newspaper stories containing relevant information. In Klein v. Bower, 421 F.2d 338 (2nd Cir. (1970), a securities case under Regulations T and U pursuant to 15 U.S.C. § 78g (1964), in which a statute of limitations defense was upheld, the court stated, at 343:

The fact remains that appellant had by his own admission sufficient knowledge . . . to put him on notice as to any alleged fraud. Therefore, the statutory period began to run then and did not await appellant's leisurely discovery of the full details of the alleged scheme.

The same plaintiff in Klein v. Bower, *supra*, returned to base his cause of action on Rule 10b-5, claiming that certain shares of stock had been purchased from him at prices maintained at an artificially low level. Klein v. H. N. Whitney, Goadby & Co., 341 F.Supp. 699 (S.D.N.Y. 1971). Again defendants raised the statute of limitations. The court sought to

determine when Klein either discovered or should have discovered the alleged fraud. Klein had stated in a sworn affidavit that he had become suspicious of a fraud as early as 1962, and later became suspicious of all manipulations of his stock generally during a suit in 1966. The court appears to have given heavy weight to Klein's admitted suspicions. It stated, at 702, that even "[i]f these suspicions did not constitute actual discovery, they surely would have prompted a man of reasonable diligence to conduct further investigations," and that further, "it is obvious that a man of reasonable diligence would have investigated the intervening transactions, particularly in light of his general suspicions." The applicable statute of limitations was held to bar the action.

■ In determining whether the statute of limitations bars this action, this court has considered two questions. First, whether the circumstances surrounding the sale of the stock and the knowledge available to Maine were sufficient to put a man of his experience and sophistication on notice, or to raise the suspicion of fraud in his mind. Secondly, if the suspicion arose or should reasonably have arisen, whether Maine exercised reasonable diligence under the circumstances to discover the alleged fraud.

As to the first question, Maine himself stated in his deposition that when he learned of the merger of ECI and Automatic Sprinkler on July 25, 1967, he became suspicious that an insider may have been involved in the purchase of his stock (Maine Dep. 130, 138), and felt that he had been defrauded. (Maine Dep. 141). He was also aware at this time of Rule 10b-5 and the obligations that it imposed, and the possibility that he could bring suit pursuant to Rule 10b-5. (Maine Dep. 125, 194). In light of the criteria listed in Clement A. Evans & Co. v. McAlpine, *supra*, it is clear that Maine possessed the "sophistication and expertise" necessary to appreciate his position, and the "knowledge of related proceedings" such as would reasonably

"excite inquiry." Furthermore, in view of Klein v. H. N. Whitney, Goadby & Co., *supra*, such suspicion as Maine admitted would surely have prompted "a reasonable man to conduct further investigations." Yet it was almost nineteen months later, on February 20, 1969, that Maine wrote Craig at Auchincloss, Parker and Redpath requesting the names of the purchasers. The writing of this letter itself firmly establishes that Maine himself felt put to the duty of inquiry. Maine stated in his deposition that his original suspicions were intensified when allegedly false claims were raised against him by the attorneys and principals of ECI during a suit in early 1969. (Maine Dep. 128, 130, 140–141). Because of their persistence in these claims, he felt that the parties might be capable of other "illegal acts" such as a stock fraud. (Maine Dep. 130). Nevertheless, Maine took no action from the time of Craig's letter of February 25, 1969, refusing to divulge the names of the stock purchasers, until May 12, 1971, when his attorney at that time, Stuart F. Carwile, made a second request for the release of the names. This period of inaction for over two years clearly raises the bar of the statute of limitations, if indeed it was not raised earlier by the running of the statute as marked by plaintiff's suspicions of fraud as early as July 25, 1967.

■ The second question considered by this court is plaintiff's assertion that his letter of February 20, 1969, constituted diligent inquiry, which was refuted in such a manner as to toll the running of the statute of limitations until April 1, 1972, when Maine discovered the personal identity of the defendants. Maine maintains that since Craig "conspired" with Smith and Leonard to deny the information from him, he was excused from complying with the agreement made at the time of sale whereby the purchasers' names would be withheld unless it was necessary to protect Maine, and any sort of "securities problem" that he might have, upon proper proof of such need. In essence, plaintiff makes out an

argument that the defendants colluded to fraudulently conceal their identities from him, and that his one letter to Craig constitutes reasonable diligence under the circumstances, and therefore "tolls" the statute of limitations. However, fraudulent concealment, of itself, is no longer a tolling device in the federal courts, and is only a factor to be used in determining whether fraud was or could have been discovered. Tobacco and Allied Stocks v. Transamerica Corp., *supra*, 143 F.Supp., at 329. It is simply one of the factors to be considered in applying the federal standard for tolling the state statute: that the statute is tolled until the fraud was, or in reasonable diligence could have been discovered. Maine stated no reason or need in his letter to Craig requesting the information. (Maine Dep. 134). At no time prior to February 20, 1969, or between that date and May 12, 1971, did Maine make any other attempt to discover the identity of the purchasers of his stock. (Maine Dep. 134–135). Also, Maine's Attorney, Richard H. Barrick, was aware of the agreement and the conditions of disclosure as shown by Craig's letter to Barrick stating that the names would be released upon a proper showing of need. (Craig Dep. 54–56; Maine Dep. 132–133, 139). Yet Maine never consulted an attorney regarding his right to receive the information prior to consulting Mr. Carwile in 1971. (Maine Dep. 135). Maine made no attempt beyond his one letter to Craig to contact any other representative of Auchincloss, Parker and Redpath in an effort to secure that information. (Maine Dep. 135). The "concealment" complained of by plaintiff was an original element of the sale to which he raised no objection. Plaintiff would now have the court excuse his inaction by claiming that Craig. was in collusion with Smith and Leonard and implying that the names would not have been released even if Maine had proceeded pursuant to the agreement. It appears to be only hindsight that suggests that the names would not have been released upon a proper showing—for Maine had no particular suspicion that Craig was involved in any way at this time. (Maine Dep. 128–129). In sum, Maine did not inquire of anyone but Craig at the brokerage, did not consult any outside sources or even his attorney until 1971, and did not even comply with the original terms of the sale whereby the names of the purchasers would be released upon a proper showing of need. In almost four years' time, the only effort undertaken by plaintiff to discover the identity of the defendants was one letter. To consider this rather desultory action as meriting tolling of the statute of limitations —in view of plaintiff's acknowledged suspicions, the avenues open by which he could have uncovered the alleged fraud, his sophistication and expertise and knowledge of related proceedings—would be an affront to the concept of reasonable diligence as developed in the aforementioned authorities.

### COUNTERCLAIM

Counterclaimant Leonard contends that Maine, as an officer and chief engineer of ECI, participated directly or indirectly in a secret destruction of the principal equipment developments of ECI in and before April, 1967, in order to compel ECI to turn over its principal contracts to a new engineering group to be headed by Maine. The counterclaim alleges that, largely as a result of such destruction, the shares of ECI stock sold at two dollars each to Leonard were substantially worthless, to Maine's concealed knowledge, and the failure of Maine to so advise Leonard constitutes a fraud within the meaning of Rule 10b-5.

As chief engineer at ECI, Maine's work centered around three principal related developments in loran technology, (1) creating a microminiaturized (integrated circuit) automatic cycle identification circuit for the Netherlands Navy to be used to improve an ECI Navy A/C loran, the SPN–40, (2) development of a microminiaturized automatic loran "A" for commercial sale, and (3) development of a microminiaturized automatic loran "C" (Man-Pack) for sale to the Army.

Leonard, a Washington attorney, became familiar with ECI as early as spring of 1967, when he represented John Zentmeyer, the president of ECI, in litigation brought by Sperry Rand Corporation against ECI. During this representation, he became aware of "this cloud hanging over everything in the case at the time as to what had happened to the principal developments of the company" (ECI), and he has stated that at this time "charges, of course, were leveled in all directions." (Leonard Dep. 81). Later, Leonard played an active role as an attorney in arranging the acquisition of ECI by Automatic Sprinkler (Leonard Dep. 93), which took place before Leonard purchased the ECI stock. (Leonard Dep. 98).

Leonard had contemplated purchasing ECI stock at least a month before he bought it from Maine at two dollars a share through a brokerage, but had been asked $2.75 a share and turned the offer down. (Leonard Dep. 99). From the beginning, Leonard intended to purchase the stock without disclosing his identity, and to make this a condition of the transaction. (Leonard Dep. 102). Maine had received a letter from Leonard, held by Craig, attesting that Leonard was aware of the unregistered nature of the stock. (Craig Dep. 36, 42; Maine Dep. 125–126). Maine says that he informed Craig at the time of sale that in his opinion, the suits against ECI had rendered the value of its stock "not very great." (Maine Dep. 125).

Leonard concedes in his deposition that he had reasonable knowledge in 1967 or early 1968 that two important ECI prototypes (the "Netherlands loran" and the "Loran A micro min") had been de-wired by Maine prior to April 1, 1967 (Leonard Dep. 83–84, 104, 114), and were not rebuilt prior to Maine's dismissal from ECI employ several weeks later. In his counterclaim, Leonard avows that in early April 1967, and later under oath on June 7, 1967, Maine stated in his presence, and that of defendant Smith, that the two pieces of destroyed equipment were cut up by him in the process of "cleaning them up" and could be restored easily. Leonard also states that Maine denied at this time that he had taken or destroyed other ECI equipment, and that "in major reliance" on these statements Leonard was induced to purchase Maine's stock.

Leonard concedes that he knew in 1967 that Maine had openly taken an antenna coupler from the roof of ECI when leaving its employ. Leonard suspected that the coupler did not belong to Maine, but he did not pursue the matter at that time. (Leonard Dep. 111–112). Leonard also concedes that he heard of the explosive destruction of the automatic direction finder (ADF) prototype in mid-1967, an event then generally regarded as accidental.

As a result of the troubles at ECI, Leonard, then attorney for Automatic Sprinkler, which had acquired the assets of ECI, filed a complaint for breach of an insurance contract under a "blanket honesty bond" covering ECI employees, against the Insurance Company of North America on May 8, 1968, in the United States District Court for the District of Columbia.[1] That complaint states in part that "[o]n or about April 1, 1967, ECI suffered a covered loss in excess of the applicable policy limit of $100,000.00, *as a result of the unlawful destruction of experimental electronic equipment by four of its engineering employees*" (emphasis added) (a crossclaim by ECI filed in 1971 alleges damages in excess of $500,000).

In Leonard's estimation, ECI had assets of less than a quarter of a million dollars. (Leonard Dep. 95). Reuben E. Maine was one of the four employees subsequently joined as a third-party defendant by motion of Insurance Corporation of North America (hereinafter,

---

1. The action was subsequently transferred to the Western District of Virginia. Automatic Sprinkler Corporation of America v. Insurance Company of North America, defendant v. Reuben E. Maine, et al., third-party defendants (No. 68–16–C) (mistrial, June, 1971; settled before retrial).

INA) on August 22, 1968 (a fifth employee was later added).

Leonard argues that testimony taken prior to his filing an amended complaint and crossclaim in the INA suit on November 2, 1970, opened up a whole new field of investigation to him regarding the allegations concerning Maine. Specifically, he maintains that the testimony of Mrs. Ruth Hughes, an ECI technician, implied that the ADF prototype had been deliberately tampered with by someone, because a piece of raw solder had been found wrapped around a component of the ADF after it had "blown up" during a test in 1967. This testimony, according to Leonard, led him to interview a young technician, John Davidson, who had worked with Maine, and who indicated that a certain Man-Pack component whose existence was theretofore unknown even to the president of ECI had in fact been demonstrated by Maine to laboratory personnel at ECI in early 1967 and had thereafter been completely disassembled before Maine left ECI. (Leonard Dep. 104–106). It was also at this time in 1970 that Leonard "concluded" that the antenna coupler that Maine took from the roof of ECI in 1967 in fact belonged to ECI because the parts built into the coupler were identical in model and make to stock parts kept at ECI.

Leonard contends that knowledge of these facts, which he gained in October of 1970, first gave rise to his belief that all of the incidents explained in various ways by Maine "were probably linked together in an effort to destroy ECI," and, therefore he contends that the statute of limitations on the counterclaim did not begin to run until that time at the earliest.

With that contention this court cannot agree. Considering the circumstances peculiar to this case, this court is of the opinion that Leonard was cognizant of sufficient facts and relevant allegations, imposing upon him a duty of reasonable diligence, which if pursued would have disclosed the alleged fraud before May 31, 1970, the earliest date at which the statute of limitations could have begun

to run had this court found Leonard's counterclaim to have been timely made. Leonard's legal sophistication and business acumen is evident from the record. When asked while being deposed in this case if he were familiar with the obligations of Rule 10b-5, he stated: "Utterly and completely, it's the first thing I think of in terms of any purchase or sale of stock." (Leonard Dep. 102). His role as an attorney for ECI and its president and his knowledge of all the proceedings involving ECI placed him in a unique position to become aware of the reasons why his stock lost value. Leonard was privy to the most material factor involving the value of his stock— that ECI's assets had been severely damaged by the destruction of various prototypes, and he was aware at least since August 22, 1968, when Maine was joined as a third-party defendant in the suit against INA, that Maine was alleged to be a primary suspect. Yet, at no time after learning of the allegations that Maine had destroyed or stolen ECI property did Leonard identify himself to Maine as the purchaser of some of his stock and demand an explanation or ask for disclosure of any of Maine's "inside" information. (Leonard Dep. 115). Indeed, it was not until 1972 when Maine filed a suit that Leonard made known his identity as purchaser to Maine. (Leonard Dep. 103). This in itself is highly indicative of a failure to exercise reasonable diligence in discovering the alleged fraud.

Though this court is not informed as to the circumstances surrounding Maine's statement under oath to Smith and Leonard on June 7, 1967, that he had not destroyed any ECI property, this court can at least infer from this that Leonard was aware even before his stock purchase that Maine was under some suspicion. Even if the statute of limitations cannot be said to begin to run at this early date, it certainly can by August 22, 1968, when Leonard was at least put to a duty of reasonable inquiry when Maine was brought into the ECI suit against INA as a third-party defendant.

To quote once again from Klein v. Bower, *supra*, 421 F.2d, at 343, "the statutory period began to run then and did not await . . . leisurely discovery of the full details of the alleged scheme." The "new discoveries" of October, 1970, that prompted Leonard to "reconsider" the facts previously known to him were either available to him before that time, or would have been, had reasonable diligence been exercised. As to the alleged evidence of tampering with the ADF prototype, for example, Mrs. Hughes had stated in a deposition on April 30, 1969, in the Sperry Rand Corporation suit against ECI in which Leonard was involved as an attorney, that the solder was "wrapped" around one of the components and "it looked like it had been put there deliberately." [2]

Mrs. Hughes testified that two other ECI employees were present when the solder was discovered on March 27, 1967, and a third was informed of the discovery.

As has been stated, there is no requirement that all of the details of an alleged scheme be fully discovered before the statute of limitations begins to run. While Leonard may now be more certain in his allegations as a result of his "discoveries" of October, 1970, on the basis of his own admissions, this court must conclude that he had ample cause for suspicion in May or August, 1968, and certainly by the time of Mrs. Hughes' deposition on April 30, 1969, that put him to a duty of inquiry that would have lead him, in reasonable diligence, to the same conclusions and propositions that he now asserts before this court.

For the foregoing reasons, this court finds the principal cause of action, as well as the counterclaim, barred by the applicable statute of limitations. The case is dismissed, and the same is thereby ordered, and each party shall bear his own costs.

2. Hughes Dep. 18, taken on April 30, 1969 cited by Leonard in his "Affidavit of Counsel as to Notice to Insurer of Claim on ADF" filed in *A–T–O, Inc.* (formerly Automatic Sprinkler Corporation of America) v. Insurance Company of North America, defendants, v. Reuben E. Maine, et al., third-party defendants, dated June 23, 1971. Leonard contends in the affidavit that the ADF was included in the original complaint alleging destruction of ECI equipment, which was filed May 8, 1968.